Margaret Rayburn GOOD, formerly
known as Margaret Rayburn,
Appellant,

v.

IOWA CIVIL RIGHTS
COMMISSION, Appellee,

Clayton Christensen, District Governor
597 and Regional Office of Rotary International, Intervenors/Appellees.

No. 84–687.

Supreme Court of Iowa.

May 22, 1985.

Faith O'Reilly, and Mark W. Bennett of Babich, Bennett & Nickerson, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Teresa Baustian, Asst. Atty. Gen., for appellee Iowa Civil Rights Com'n.

P.L. Nymann, Sioux City, for intervenors/appellees.

LARSON, Justice.

The petitioner, Margaret Rayburn Good, has appealed from an adverse ruling on her petition for judicial review of a civil rights commission ruling which dismissed her complaint of sex discrimination under Iowa Code chapter 601A. After a long series of administrative proceedings, and conflicting rulings by its hearing officers, the civil rights commission had concluded that: (1) the commission lacked jurisdiction of the proper respondent, Rotary District 561, because an attempted amendment adding it to the complaint was untimely; and (2) in any event, the action complained of was excluded from coverage of the act because the program involved was not a "public accommodation" as defined by Iowa Code section 601A.2(10) (1977). In a judicial review proceeding, the district court agreed. On appeal, we affirm.

In 1976, District 561 of Rotary International planned an exchange program with a counterpart in Wales. The program, called the Group Study Exchange Program, provided for a team of young men from the Rotary District to visit a similar district in Wales for six weeks. That district, in turn, was to send a team to the local district. Rotary District 561 had a committee active in recruiting candidates for this trip. The defendant, Clayton Christensen, was chairman of the search committee and wrote letters to individual clubs within the district to publicize the program. Letters to local clubs listed these criteria for consideration of candidates: "Non-member of Rotary, between the ages of 25 and 35, and established in a business or profession."

Although the trip was not advertised, Good saw a news article about it in her local newspaper, The Denison Review. That article stated that the Rotary Club "is seeking young farmers and business or professional men (below age 35) to apply for a six-week exchange trip to Wales, Great Britain [sic]. The only requirement is that the applicant not be related to a member of Rotary." Good obtained an application for the trip from the local club. She completed it and returned it to the Denison Rotary Club, which approved it and forwarded it to defendant Christensen for his action on behalf of Rotary. Christensen, in turn, sent it to Walter Reckling, Governor of District 561. (While the regional office of Rotary and Christensen are named separately as defendants, we will simply refer to them collectively as the Rotary). After a discussion with Reckling, Christensen wrote Good to tell her that the search committee could not consider her application because the Group Study Exchange Program was available to males only. The committee ultimately selected five persons, all males. Margaret Good then filed this complaint with the civil rights commission.

I. *The "Untimely Amendment."*

The commission and Rotary contend that the commission lacked jurisdiction of District 561, because there was an untimely amendment to add it as a party to the proceedings. Ms. Good commenced the administrative proceeding by filing a complaint with the commission on May 19, 1977, naming as parties "Clayton Christen-

sen, District Governor 597 and the Regional Office of Rotary International." (Although chairman of the group study exchange committee for District *561*, Christensen's correspondence with Good was on a letterhead showing he was "District Governor *597* (1970–1971)." This apparently was the reason for erroneously naming District 597.).

The commission began its investigation of the complaint and, in October 1977, Good filed an amendment to her complaint, naming District 561 as a party since the alleged discriminatory acts took place in that district. On December 29, 1977, the commission found probable cause to proceed with the complaint. Five months later, plaintiff further amended her complaint to add additional parties, including several rotary clubs, the Rotary Foundation, and Rotary International. The commission attempted conciliation in June of 1978. It was unsuccessful, however, and the case proceeded to hearing.

Prior to the hearing, the parties entered into a stipulation deleting the various rotary organizations previously added by amendment. Specifically, it provided: "[the matter] shall proceed based only upon the original Complaint file on May 19, 1977 . . . ." and that "the only respondents shall be those named in the caption above." The intended effect of the stipulation, according to petitioner, was to "retain only those parties who had been directly involved in the alleged discrimination." The actual effect, however, was far more significant: it effectively eliminated District 561, where the alleged discrimination had occurred, as a named party in the complaint. (Only District 597 and the "regional office" had been named in the original complaint.).

Two months later, in July of 1981, more than four years after the filing of the original complaint, plaintiff once again amended her complaint, this time specifying that District 561 had always been an intended party in the proceedings. Petitioner argues that District 561 was "misidentified" in the original complaint as the "regional office," and the amendment was, therefore, merely the correction of an inadvertent error. The commission and Rotary, on the other hand, claim that this was the first time that they had notice that District 561 was a party to these proceedings. The amendment prompted a special appearance on behalf of District 561, based upon its claim that the amendment was not timely, and therefore the commission was without jurisdiction over it. Iowa Code section 601A.14(15) (1977), which was in effect at the time, required a complaint to be filed within 120 days of the alleged discriminatory act.

■ Despite the fact that District 561 was actually named in the proceedings after the 120-day period for asserting such a claim, it was in fact participating in them from the very beginning. We agree with Good that amending the complaint to add District 561 was not tantamount to filing an original complaint against it. It was already deeply involved in the matter and had been since its inception. The amendment only made the face of the complaint reflect the true status of the case. Despite our deference to administrative interpretations of a statute, as we discuss later, we disagree with the commission and the district court on this issue. We conclude that District 561 was properly added as a party to these proceedings. *See Buchholtz v. Iowa Department of Public Instruction,* 315 N.W.2d 789 (Iowa 1982).

II. *Was the Exchange Program a Public Accommodation Within the Meaning of Section 601A.2(10) (1977)?*

Good's complaint alleged that Rotary International violated the Iowa Civil Rights Act, which prohibits, among other things, discrimination on the basis of sex in a public accommodation. Specifically, Iowa Code section 601A.7 (1977), states:

1. It shall be an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation or any agent or employee thereof:

*a.* To . . . deny to any person because of . . . sex . . . the accommodations, advantages, facilities, services, or privi-

leges thereof, or otherwise to discriminate against any person because of ... sex ... in the furnishing of such accommodations, advantages, facilities, services, or privileges.

*b.* To directly or indirectly advertise or in any other manner indicate or publicize that the patronage of persons of any particular ... sex ... is unwelcome, objectionable, not acceptable, or not solicited.

■ Because section 601A.7 specifically applies only to public accommodations, jurisdiction over this case exists only if the Rotary offer was a public accommodation within the meaning of that statute. The relevant definitional statute is section 601A.2(10) (1977), which provides:

*"Public accommodation"* means each and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities, or goods to the general public for a fee or charge, provided that any place, establishment, or facility that caters or offers services, facilities, or goods to the general public gratuitously shall be deemed a public accommodation if the accommodation receives any substantial governmental support or subsidy. Public accommodation shall not mean any bona fide private club or other place, establishment, or facility which is by its nature distinct-

ly private, except when such distinctly private place, establishment, or facility caters or offers services, facilities, or goods to the general public for fee or charge or gratuitously, it shall be deemed a public accommodation during such period.

This section, therefore, clearly indicates that a private club or organization, like Rotary, is prohibited from discriminating on the basis of sex only if it offers goods or services to the general public. The crucial question before this court then is whether Rotary International offered the group exchange program to the general public.[1]

Petitioner claims that when Rotary International, concededly a private club, offered the group study exchange program to the "general public," it functioned as a "public accommodation" within the meaning of Iowa Code section 601A.2(10) (1977). Chapter 601A generally defines public accommodation as a place or facility that serves the general public. Unfortunately, it does not define the term "general public," except to say that "general public" is what makes the private club a public accommodation and brings it within the jurisdiction of the act. For all practical purposes, the issue of the definition of "general public" within the meaning of Iowa Code section 601A.2(10) (1977) is one of first impression.[2]

---

1. House File 2466, effective July 1, 1984, amends Iowa Code section 601A.2(10) (1983) as follows:

> 10. "Public accommodation" means each and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities, or goods ~~to the general public~~ for a fee or charge to nonmembers of any organization or association utilizing the place, establishment, or facility, provided that any place, establishment, or facility that caters or offers services, facilities, or goods to the ~~general public~~ nonmembers gratuitously shall be deemed a public accommodation if the accommodation receives ~~any substantial~~ governmental support or subsidy. Public accommodation shall not mean any bona fide private club or other place, establishment, or facility which is by its nature distinctly private, except when such distinctly private place, establishment, or facility caters or offers services, facilities, or goods to the ~~general public~~ nonmembers for fee or charge or gra-

tuitously, it shall be deemed a public accommodation during such period. 1984 Iowa Legis.Serv. 97 (West) (now embodied in section 601A.2(10) (1985).

This amendment obviously eliminates the question of the meaning of the term "general public" from the question of when a public club shall be deemed a public accommodation. The impact of this amendment is that the question of the interpretation of the term "general public" is presented in this case for the first and last time.

2. An attorney general opinion, 1966 Op.Att'y. Gen. 285, 286, however, concluded that school bus transportation provided by the school districts did not constitute a public accommodation because it was not offered to the general public, which includes all people. *See also Iowa Farmers Purchasing Association, Inc. v. Huff,* 260 N.W.2d 824 (Iowa 1977) (dictum interpreting term "public" as opposed to "general public" in context of chapter 504.)

In reviewing an administrative agency's interpretation of a statute, this court may give some weight to the agency's determination, but "the meaning of a statute is always a matter of law, and final construction and interpretation of Iowa statutory law is for this court." *Schmitt v. Iowa Department of Social Services,* 263 N.W.2d 739, 745 (Iowa 1978). Our review in this case, however, is not without its limited perimeters. Although construction of this statute is a function of the courts, we have always held that a reviewing court should give appropriate weight to the judgment of agencies charged with the special duty of administering a particular statute. *West Des Moines Education Association v. Public Employment Relations Board,* 266 N.W.2d 118, 124–25 (Iowa 1978). *See also* 2 A. Sutherland, *Statutory Construction* § 49.05, at 362–63 (4th ed. 1984).

Here, the civil rights commission ruled that Good was not covered by the act, and we give weight to that interpretation. On the other hand, the legislature has specifically required that the act be construed liberally to effect its purposes. Iowa Code § 601A.18 (1977).

Good argues that a public accommodation under the interpretation given to it by the commission and Rotary, could easily evade the act. A bar or restaurant, for example, otherwise qualifying as a public accommodation under section 601A.2(10), could not lawfully discriminate on the basis of impermissible criteria. However, if the bar or restaurant set up some nondiscriminatory criteria for its customers (*e.g.,* minimum age of 19, which all bars must legally do), the restaurant is no longer serving "the general public," only a class of the public. Since it does not serve the general public, it is not a public accommodation covered by the provisions of 601A. The act would, therefore, be successfully evaded, according to her argument.

In this case, however, several criteria were applied by Rotary to each candidate's application:

1. He must be high moral character.

2. He must be intelligent.

3. He must be cooperative.

4. He must be presentable in appearance.

5. He must be able to express himself clearly and logically.

6. He must be in good health.

7. He must have a good sound general education.

8. He must be interested in and show enthusiasm for his chosen vocation.

9. He must have outstanding or at least above average skill.

10. He must have been employed in any recognized business or profession on a full-time basis for a period of at least two years prior to making application for membership on a group study team.

11. He must by his interest and active participation in community affairs be a good citizen.

12. He must be a citizen of the county in which he resides.

13. He either be employed or reside in the rotary district which endorses his candidacy.

14. He must not be a relative of a rotarian by blood or marriage.

15. He must be between the ages of twenty-five and thirty-five, inclusive, at the time of his application.

Should a class of persons, limited by these criteria, nevertheless be considered the "general public" for purposes of the civil rights act? Even under a liberal reading of the act, we think not. Statutes should be given their ordinary meaning unless defined by the legislature or possessed of a particular and appropriate meaning in law. *American Home Products Corp. v. Iowa State Board of Tax Review,* 302 N.W.2d 140, 143–44 (Iowa 1981). Each word and each part of the statute have a presumed purpose. *Iowa Department of Transportation v. Nebraska-Iowa Supply Co.,* 272 N.W.2d 6, 11 (Iowa 1978).

Under these principles, we must look very closely at the terms "general" and "public" and determine whether they should be separately construed to effect their ordinary meaning. Black's Law Dictionary 812 (rev. 4th ed. 1968) defines general as follows:

GENERAL. From Latin word genus. It relates to the whole kind, class, or order. Pertaining to or designating the genus or class, as distinguished from that which characterizes the species or individual; universal, not particularized, as opposed to special; principal or central, as opposed to local; open or available to all, as opposed to select; obtaining commonly, or recognized universally, as opposed to particular; universal or unbounded, as opposed to limited; comprehending the whole or directed to the whole, as distinguished from anything applying to or designed for a portion only. Extensive or common to many.

(Citations omitted.) The term public is defined as "of, relating to, or affecting the people as an organized community." Webster's Third International Dictionary 1836 (1976). The connotation of the definition is that public can mean a segment of a population while the term general appears to involve the whole of the group that it speaks of.

This court has had the opportunity to interpret the term "general public" in another context. In *Iowa Farm Purchasing Association, Inc. v. Huff*, 260 N.W.2d 824 (Iowa 1977), we distinguished between the public and the general public in construing Iowa Code chapter 503A. We held that the public, as opposed to the general public, can mean any group or segment, however characterized, of the aggregate of the citizens of a political entity. Based upon this distinction, we concluded that a purchasing association which dealt with farmers does deal with the public, rather than the general public.

We agree with the commission and the district court, that the activities complained of here did not involve the "general public" under the meaning of our civil rights act.

We have considered other alternative arguments presented by the Rotary. Under our disposition in this case, it is not necessary to resolve these other grounds for affirmance.

We affirm the district court.

AFFIRMED.

All Justices concur except CARTER, J., who concurs in the result, McCORMICK, J., who dissents, and REYNOLDSON, C.J., and UHLENHOPP, HARRIS, and SCHULTZ, JJ., who take no part.

McCORMICK, Justice (dissenting).

Any doubt concerning the General Assembly's intent in defining public accommodation was removed by the 1984 amendment to Iowa Code section 601A.2(10). *See* 1984 Iowa Acts ch. 1096, § 1. The amendment makes the statute applicable when the accommodation is extended to "nonmembers of the organization or association...." An amendment may indicate an intent to change the meaning of a statute or to clarify the meaning. *Barnett v. Durant Community School District*, 249 N.W.2d 626, 629 (Iowa 1977). One well recognized indication of legislative intent to clarify the statute is doubt or ambiguity concerning its meaning. When the amendment occurs in the midst of controversy about the proper construction of the statute, the amendment is entitled to great weight in ascertaining the intended meaning of the prior law. *Id.*

That situation exists here. I believe the amendment was enacted in response to the present controversy. Because the amendment resolves the doubtful meaning in favor of the construction of the statute advocated by petitioner, I would reverse the district court and remand the case to the commission for further proceedings.