# IN THE SUPREME COURT OF IOWA

No. 08–0428

Filed June 4, 2010

**MELISSA LEE RENDA,**

Appellant,

vs.

**IOWA CIVIL RIGHTS COMMISSION,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Donna L. Paulsen, Judge.

Petitioner appeals from district court's decision affirming Iowa Civil Rights Commission's decision that it did not have jurisdiction to hear petitioner's claim. **AFFIRMED IN PART, REVERSED IN PART AND CASE REMANDED.**

Roxanne Barton Conlin and Melinda Ellwanger of Roxanne Conlin & Associates, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Teresa Baustian, Assistant Attorney General, for appellee.

**HECHT, Justice.**

Melissa Renda, an inmate at the Mt. Pleasant Correctional Facility, filed a complaint with the Iowa Civil Rights Commission (ICRC) alleging sexual harassment and retaliation in her employment and housing. The ICRC concluded it did not have jurisdiction to hear Renda's complaint because the correctional facility was not a "dwelling," and, as an inmate, Renda was not an "employee" for purposes of the Iowa Civil Rights Act (the Act). Renda sought judicial review, and the district court affirmed the decision of the ICRC. On appeal, we agree that a correctional facility is not a dwelling for purposes of the Act, but we conclude Renda's status as an inmate working within the prison did not necessarily preclude her status as an employee. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

Melissa Renda filed a complaint with the ICRC on June 27, 2007. According to the complaint, Renda began working as a receiving and discharge clerk in November 2005 while she was incarcerated at the Mt. Pleasant Correctional Facility. According to Renda, the clerk position was the most respected and highest paid job within the prison. Shortly after she started working in the receiving and discharge department, officer Jim Ackles, who also worked in the department, began making romantic overtures toward her. In addition to the sexual advances, Ackles also gave her gifts and money in violation of prison policy. At one point, he forced her to forge a property receipt to cover up the fact that he had given her a CD. Ackles threatened to have Renda transferred to the correctional institution in Mitchellville if she reported his conduct to prison authorities.

In June of 2006, Renda was approached by an investigator following up on an anonymous report of Ackles' inappropriate behavior. Out of fear, Renda refused to talk to the investigator and was punished by being placed in solitary confinement for nine days. After getting out of solitary confinement, she returned to her job but was fired a few days later "on trumped up charges." Eventually, Renda cooperated with the investigation into officer Ackles' behavior, and when the investigation was closed, Renda was informed that she was "100% credible" and that her allegations were "founded." Despite the results of the investigation, Renda became depressed about the ordeal and lost her "level 4 status" because she was irritable to others. She felt ostracized, and she was later denied a job in the recreation department because of the forged property receipt incident.

In her complaint filed with the ICRC, Renda claimed she was discriminated against on the basis of her sex and that she was retaliated against in the areas of employment and housing. The ICRC closed her complaint as "non-jurisdictional" because the complaint did "not allege a 'discriminatory practice' as defined by Iowa Code Chapter 216." Specifically, the ICRC determined that an inmate is not considered an employee and a prison is not considered a dwelling under the Act.

Renda sought judicial review, and the district court affirmed the decision of the ICRC. Renda appeals.

## II. Scope and Standards of Review.

Judicial review of an agency decision is controlled by the provisions of Iowa Code section 17A.19(10) (2009).[1] *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 601 (Iowa 2004). We will

---

[1]Unless otherwise noted, all statutory citations are to the current version of the Iowa Code.

apply the standards of section 17A.19(10) to determine if we reach the same results as the district court. *Id.* The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner and if the agency action meets one of the enumerated criteria contained in section 17A.19(10)(*a*) through (*n*). *Id.*

The parties disagree about whether subsection (*c*) or (*l*) applies to our review of ICRC's interpretation of the terms "employee" and "dwelling" as used in the Act. Renda contends section 17A.19(10)(*c*) applies because the ICRC has not been clearly vested with the authority to interpret the Act, and accordingly, we are free to substitute our judgment for that of the ICRC. *See* Iowa Code § 17A.19(10)(*c*). The ICRC argues subsection (*l*) applies because it has been vested with the authority to interpret the Act, and, as a result, we must defer to the agency's interpretation and may only reverse if the interpretation is "irrational, illogical, or wholly unjustifiable." *Id.* § 17A.19(10)(*l*).

We begin by noting that despite the parties' articulation of the issue as whether the ICRC has the authority to interpret the Act, we do not view the issue so broadly. The focus of our inquiry is not whether the ICRC has the authority to interpret the entire Act. Rather, we must determine whether the interpretation of the specific terms "employee" and "dwelling" has been clearly vested in the discretion of the commission.

We have not addressed the standard of review of statutory interpretation by the ICRC subsequent to the amendment and clarification of chapter 17A in 1998. We addressed the standard of review of the ICRC's interpretation of various provisions of the Act on several occasions before chapter 17A was amended. Unfortunately, however, many of our decisions from that period did not clearly articulate

the standard of review applied in reviewing the commission's statutory interpretations. In *Good v. Iowa Civil Rights Commission,* 368 N.W.2d 151 (Iowa 1985), we concluded that

> [i]n reviewing an administrative agency's interpretation of a statute, this court may give some weight to the agency's determination, but "the meaning of a statute is always a matter of law, and final construction and interpretation of Iowa statutory law is for this court." Our review in this case, however, is not without its limited perimeters. Although construction of this statute is a function of the courts, we have always held that a reviewing court should give appropriate weight to the judgment of the agencies charged with the special duty of administering a particular statute.

*Good,* 368 N.W.2d at 155 (quoting *Schmitt v. Iowa Dep't of Soc. Servs.,* 263 N.W.2d 739, 745 (Iowa 1978)); *see also Sommers v. Iowa Civil Rights Comm'n,* 337 N.W.2d 470, 472 (Iowa 1983) (stating that when reviewing the ICRC's interpretation of statutory provisions "we may give deference to, but are not bound by," the ICRC's interpretation because "[t]he ultimate interpretation of Iowa statutory law is the province of the supreme court"). We do not find these early articulations of the level of deference to be granted the ICRC's statutory interpretation particularly illuminating to our determination of whether subsection (*c*) or (*l*) of the current section 17A.19(10) applies.

The amendments to chapter 17A clarified when the court should give deference to an agency's interpretation of law.

> Normally, the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly so, a court is free to, and usually does, substitute its judgment *de novo* for that of the agency and determine if the agency interpretation of the statute is correct. . . . But, where the General Assembly clearly delegates *discretionary* authority to an agency to interpret or elaborate a statutory term based on the agency's own special expertness, the court may not simply substitute its view as to the meaning or elaboration of the term for that of the agency but, instead, may reverse the agency interpretation or elaboration only if it is arbitrary, capricious,

unreasonable, or an abuse of discretion—a deferential standard of review.

Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998) [hereinafter Bonfield].  Notably, section 17A.10(*c*) does not require that the discretion be "expressly" vested in the agency, but instead uses the less restrictive term "clearly."

> This means that the reviewing court, using its own independent judgment and without any required deference to the agency's view, must have a firm conviction from reviewing the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved, that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration of the provision in question.

*Id.* at 63.

The question of whether interpretive discretion has clearly been vested in an agency is easily resolved when the agency's enabling statute explicitly addresses the issue.  For example, in *Iowa Ass'n of School Boards v. Iowa Department of Education*, 739 N.W.2d 303 (Iowa 2007), we noted that the enabling statute provided the director of the department of education " 'shall . . . [i]nterpret the school laws and rules relating to the school laws.' " *Iowa Ass'n of Sch. Bds.*, 739 N.W.2d at 307 (alterations in original) (quoting Iowa Code § 256.9(16) (2003)).  The explicit grant of authority made clear the General Assembly's intent to vest the discretion to interpret the laws with the department, and we concluded that the department's interpretation was entitled to deference pursuant to section 17A.19(10)(*c*).  Similarly, in *Mosher v. Department of Inspections & Appeals*, 671 N.W.2d 501, 509–10 (Iowa 2003), we concluded that because the General Assembly had explicitly given the authority to interpret the phrase "dependent adult" to a different agency, by

implication it had not delegated the interpretive authority to the department of inspections and appeals.

However, because the legislature does not usually explicitly address in legislation the extent to which an agency is authorized to interpret a statute, most of our cases involve an examination of the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency. This sort of analysis has not proven conducive to the development of bright-line rules. It must always involve an examination of the specific statutory language at issue, as well as the functions of and duties imposed on the agency. It is conceivable that the legislature intends an agency to interpret certain phrases or provisions of a statute, but not others.

Our first occasion to examine whether an agency had been granted the authority to interpret a statute under the amended chapter 17A was *City of Marion v. Iowa Department of Revenue & Finance*, 643 N.W.2d 205 (Iowa 2002). In that case, we confronted the question of whether the department had correctly interpreted the term "athletic sport" to include swimming. 643 N.W.2d at 206. We noted that "athletic sport" was not defined in the statute and that the department had been given the authority to create rules " 'necessary and advisable for its detailed administration.' " *Id.* at 207 (quoting Iowa Code § 422.68(1) (2001)). We concluded that because the term was not defined in the statute and because the department must necessarily interpret the term in order to carry out its duties, the power to interpret the term was clearly vested in the department and deference was therefore given. *Id.*

We have reached similar conclusions in several more recent cases. In *Auen v. Alcoholic Beverages Division,* 679 N.W.2d 586, 590 (Iowa 2004), we concluded the division had been vested with the authority to interpret the phrase "directly or indirectly being interested in the ownership" of another licensee. We again relied on the division's rulemaking authority and the necessity of interpreting that phrase in conducting the division's work. *Auen,* 679 N.W.2d at 590. Likewise, *ABC Disposal Systems* addressed whether the Iowa Department of Natural Resources (DNR) had the authority to interpret the term "sanitary disposal project." 681 N.W.2d at 602. Because the DNR had the authority to establish rules " 'relating to the establishment and location of sanitary disposal projects,' " we concluded the legislature had clearly vested the authority to define what constituted a "sanitary disposal project." *Id.* (quoting Iowa Code § 455B.304(1) (2001)); *see also City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 527 (Iowa 2008) (concluding the " 'broad general powers to effect the purposes' of chapter 476, which includes the authority to regulate public utility rates," vested the utilities board with authority to interpret the rates and services provision of section 476.1 (quoting Iowa Code § 476.2(1) (2005))); *Birchansky Real Estate, L.C. v. Iowa Dep't of Pub. Health,* 737 N.W.2d 134, 138 (Iowa 2007) (holding authority of department to make final decision on all "certificate of need" applications coupled with rulemaking authority demonstrated that the authority was clearly vested with the department to interpret an exception to the certificate of need requirements); *Iowa Ag Constr. Co. v. Iowa State Bd. of Tax Review,* 723 N.W.2d 167, 173–74 (Iowa 2006) (concluding that the board's rulemaking authority also gave it the authority to determine whether certain equipment was "directly and primarily used in livestock production");

*Thoms v. Iowa Pub. Employees' Ret. Sys.,* 715 N.W.2d 7, 11 (Iowa 2006) (holding rulemaking authority gave IPERS the authority to interpret a statutory provision providing for calculation of retirement benefits).[2]

However, we have not concluded that a grant of mere rulemaking authority gives an agency the authority to interpret *all* statutory language. We have determined that the department of revenue has not been vested with the special authority to interpret the term "competent evidence" as it is used in chapter 622, the evidence code. *Lange v. Iowa Dep't of Revenue,* 710 N.W.2d 242, 247 (Iowa 2006). We likewise noted that while the Iowa Finance Authority had been given " 'all of the general powers needed to carry out its purposes and duties, and exercise its specific powers' " as well as the authority to adopt rules " 'necessary for the implementation of the title guaranty program,' " the agency did not have the authority to interpret the terms "hardship" and "public interest"

---

[2]However, despite the abundance of authority concluding an agency with the authority to enforce a specific statute and with rulemaking authority has been clearly vested with the authority to interpret specialized terms and provisions within the subject matter statute, we reached the opposite result in *Mycogen Seeds v. Sands*, 686 N.W.2d 457 (Iowa 2004), and *P.D.S.I. v. Peterson*, 685 N.W.2d 627 (Iowa 2004), regarding the authority of the workers' compensation commissioner to interpret various workers' compensation provisions. In those cases, this court concluded that

> [w]e see nothing in the workers' compensation statutes that convinces us that the legislature has delegated any special powers to the agency regarding its interpretation of . . . statutes. So the agency's interpretation has not "clearly been vested by a provision of law in the discretion of the agency."

*P.D.S.I.,* 685 N.W.2d at 633 (quoting Iowa Code § 17A.19(10)(*c*) (2001)); *see also Mycogen Seeds,* 686 N.W.2d at 464 ("We see nothing in Iowa Code chapter 85 that convinces us that the legislature has delegated any special powers to the agency regarding statutory interpretation in these areas."). Although not acknowledged in either opinion, the workers' compensation commissioner is required to "[a]dopt and enforce rules necessary to implement" chapters 85, 85A, 85B, 86, and 87. Iowa Code § 86.8(1). The commissioner is also charged with the responsibility of presiding over contested cases brought under chapters 85, 85A, 85B, and 86 and has the authority to order payments once the parties agree on liability or the commissioner makes a determination of liability. *Id.* §§ 86.17(1), 85.21.

found in section 16.91(5). *Iowa Land Title Ass'n v. Iowa Fin. Auth.*, 771 N.W.2d 399, 402 (Iowa 2009) (quoting Iowa Code §§ 16.5, 16.91(8) (2007)). Similarly, "[a]lthough the legislature gave the labor commissioner the authority to promulgate Iowa's occupational safety and health standards under section 88.5, the legislature did not vest the interpretation of 'willful' under the penalty provision with the commissioner or the Board." *Insituform Techs., Inc. v. Employment Appeal Bd.*, 728 N.W.2d 781, 800 (Iowa 2007); *see also State v. Pub. Employment Relations Bd.*, 744 N.W.2d 357, 360 (Iowa 2008) (concluding the board was not vested with the authority to interpret a provision which would determine if the board had the authority to remedy nonwillful, as well as willful, violations of chapter 20). And, in *Doe v. Iowa Board of Medical Examiners*, 733 N.W.2d 705 (Iowa 2007), we concluded that we owed no deference to the board's interpretation of "confidential."

> Whether information is confidential is not informed by the expertise of the board, but rather focuses on the interests of the parties. The legislature did not give the board the discretion to determine what information is, and is not, confidential.

733 N.W.2d at 708.

Our review of authorities on this subject has confirmed our belief that each case requires a careful look at the specific language the agency has interpreted as well as the specific duties and authority given to the agency with respect to enforcing particular statutes. It is generally inappropriate, in the absence of any explicit guidance from the legislature, to determine whether an agency has the authority to interpret an entire statutory scheme. As we have seen, it is possible that an agency has the authority to interpret some portions of or certain

specialized language in a statute, but does not have the authority to interpret other statutory provisions. Accordingly, broad articulations of an agency's authority, or lack of authority, should be avoided in the absence of an express grant of broad interpretive authority.

We also think certain guidelines have become evident that may inform our analysis of whether the legislature has clearly vested interpretative authority with an agency. We note that when the statutory provision being interpreted is a substantive term within the special expertise of the agency, we have concluded that the agency has been vested with the authority to interpret the provisions. *See City of Coralville*, 750 N.W.2d at 527 (provisions relating to the regulation of public utility rates and services); *Thoms*, 715 N.W.2d at 11–12 (provisions relating to the calculation of retirement benefits); *ABC Disposal*, 681 N.W.2d at 602 (sanitary disposal project). When the provisions to be interpreted are found in a statute other than the statute the agency has been tasked with enforcing, we have generally concluded interpretive power was not vested in the agency. *See, e.g., Lange*, 710 N.W.2d at 247 (department of revenue's interpretation of generally applicable statutory rule of evidence); *Mosher*, 671 N.W.2d at 509 (department of inspections and appeals' interpretation of dependant adult abuse provisions). When a term has an independent legal definition that is not uniquely within the subject matter expertise of the agency, we generally conclude the agency has not been vested with interpretative authority. *See Iowa Land Title Ass'n*, 771 N.W.2d at 401–02 ("hardship" and "public interest"); *Pub. Employees Relations Bd.*, 744 N.W.2d at 359–60 ("willful" and "non-willful"); *Doe*, 733 N.W.2d at 708 ("confidential"); *Insituform*, 728 N.W.2d at 800 ("willful").

Turning to the case at hand, we first note that the Act does not explicitly grant the agency the authority to interpret the terms "employee" and "dwelling." We must then determine, after reviewing "the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved," if we are firmly convinced that "the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration" of the terms. *Bonfield* at 63.

We are not convinced the legislature intended to vest the ICRC with authority to interpret the terms at issue here. Both terms have specialized legal meaning and are widely used in areas of law other than the civil rights arena. The fact that the parties rely on definitions of these terms from various other substantive areas of law indicates the interpretation of these terms is not within the special expertise of the ICRC. The commission itself, when defining the terms and rejecting Renda's claims, relied on definitions of the terms gleaned from other areas of law, including Iowa workers' compensation statutes, Iowa unemployment compensation statutes, statutes pertaining to the department of corrections, the Federal Fair Housing Act, Federal Cable Communications Act, and Colorado penal statutes. Given the commission's need to examine such far-ranging legal sources to interpret these terms, we are not convinced that "employee" and "dwelling" are specialized terms within the expertise of the agency. Rather, these terms have specialized legal definitions that extend beyond the civil rights context and are more appropriately interpreted by the courts. Accordingly, we do not give deference to the agency's interpretation and

will substitute our judgment for that of the commission if we conclude the ICRC made an error of law. Iowa Code § 17A.19(10)(*c*).[3]

### III. Discussion.

The ICRC concluded it did not have jurisdiction over Renda's complaint because it did "not allege a 'discriminatory practice' as defined by Iowa Code Chapter 216." Specifically the commission determined that a prison is not a "dwelling" and an inmate is not an "employee" for purposes of the Act. Renda claims both of these conclusions constitute errors of law, and we will review each in turn.

**A.** **Is a Prison a "Dwelling"?** The Act prohibits discrimination on the basis of a person's sex with respect to housing. Iowa Code §§ 216.8, 216.8A. The terms "real property," "housing," "housing accommodation," and "dwelling" are used in the various statutory provisions to describe the type of facilities to which the prohibition applies. *Id.* These terms, however, are not defined in the statute. When

---

[3]We think it appropriate to note at this juncture the maxim occasionally expressed in this court's prior decisions that we give deference to an agency's statutory interpretation "in areas of the agency's expertise." *See Panda Eng'g & Land Surveying Examining Bd.*, 621 N.W.2d 196, 198 (Iowa 2001) (citing a 1995 case for the proposition that "we will give careful consideration to an agency's determination of a question of law in areas of the agency's expertise."). This maxim was derived from our understanding of the Iowa Administrative Procedure Act prevailing prior to the 1998 amendments. We conclude the 1998 amendments were calculated in relevant part to clarify the circumstances in which deference is owed by courts to agency decisions. *See Bonfield* at 59–60 (noting that the amendments to the scope of review provisions "may mildly increase the intensity of judicial review of agency action" by "providing much greater specificity" and "stating explicitly the exact circumstances in which the [court] is or is not required to give deference to an agency's view of a matter"). The 1998 amendments more clearly circumscribe the circumstances in which deference is owed by courts, substituting the specific inquiry whether a matter has been clearly vested in the agency in place of the more nebulous inquiry of whether the matter is within the agency's expertise. *See Locate.Plus.Com, Inc. v. Iowa Dep't of Transp.*, 650 N.W.2d 609, 613 (Iowa 2002); Iowa Code § 17A.19(10). Our analysis of the extent to which this court owes deference to the ICRC's definition of "employee" cannot be driven by the former standard of whether the agency has expertise in deciding who should be treated as an employee within the penal system. *Locate.Plus.Com.*, 650 N.W.2d at 613. The limits of our deference to the agency's definition must instead, consistent with the 1998 amendments, be determined by whether the legislature has clearly vested such authority in the ICRC. *Id.* As we conclude a clear vesting of such authority has not occurred, we do not give deference to the ICRC's definition of "employee."

interpreting statutory provisions, we utilize our well-established rules of statutory construction. We " 'avoid strained, impractical or absurd results.' " *Sommers*, 337 N.W.2d at 472 (quoting *Franklin Mfg. Co. v. Iowa Civil Rights Comm'n*, 270 N.W.2d 829, 831–32 (Iowa 1978)). Usually, we will give an ordinary meaning to the language, " 'but the manifest intent of the legislature will prevail over the literal import of the words used.' " *Id.* at 472–73. If the language is clear and plain, we will not utilize construction. *Id.* at 473. We " 'look to the object to be accomplished and the evils and mischiefs sought to be remedied in reaching a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.' " *Id.* All parts of the statute will be considered together, and we will not give undue importance to any single portion. *Id.*

The ICRC determined that a prison is not a dwelling by relying on a decision from a federal district court case which determined that a jail was not a dwelling for purposes of the Fair Housing Act. While interpretations of the Fair Housing Act are instructive when interpreting the housing provisions of the Iowa Civil Rights Act, they are not controlling. *State v. Keding*, 553 N.W.2d 305, 307 (Iowa 1996).

Renda directs us to various federal cases which interpret what constitutes a dwelling for purposes of the Fair Housing Act. She argues the term "dwelling" has been interpreted broadly to include a wide range of nontypical residences. The types of facilities that have been determined to constitute dwellings for purposes of the Fair Housing Act range from substance abuse treatment facilities to nursing homes, homeless shelters, hospices, and residential schools. *See, e.g., Lakeside Resort Enters. v. Bd. of Supervisors*, 455 F.3d 154, 160 (3d Cir. 2006) (substance abuse treatment facility); *Hovsons, Inc. v. Twp. of Brick*, 89

F.3d 1096, 1102 (3d Cir. 1996) (nursing home for disabled elderly people); *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 945 (9th Cir. 1996) (homeless shelter); *United States v. Columbus Country Club*, 915 F.2d 877, 881 (3d Cir. 1990) (summer bungalows run by a country club); *Lauer Farms, Inc. v. Waushara County Bd. of Adjustment*, 986 F. Supp. 544, 559 (E.D. Wis. 1997) (migrant workers' trailers); *La. Acorn Fair Hous. v. Quarter House*, 952 F. Supp. 352, 359–60 (E.D. La. 1997) (units in a time-share resort); *United States v. Mass. Indus. Fin. Agency*, 910 F. Supp. 21, 26 n.2 (D. Mass. 1996) (residential school for emotionally disturbed adolescents); *Baxter v. City of Belleville*, 720 F. Supp. 720, 731 (S.D. Ill. 1989) (AIDS hospice).

Renda argues the key to determining whether a facility is a dwelling under the Act is whether the person intends to remain at the facility for more than a brief period of time and whether the person considers the facility a residence to which he or she will return. She argues her residence at the prison is analogous to other residential facilities in that she considers her cell her residence, she returns to it each night, and her stay at the prison is for more than a brief period of time. She claims that facilities that have been found not to constitute dwellings under the Fair Housing Act, such as motels and bed and breakfasts, are distinguishable from the prison on these same grounds. *See Schneider v. County of Will*, 190 F. Supp. 2d 1082, 1087 (N.D. Ill. 2002); *Patel v. Holley House Motels*, 483 F. Supp. 374, 381 (S.D. Ala. 1979). A person does not usually intend to stay at a motel or bed and breakfast for an extended period, and a person does not generally consider a motel a residence or home.

Although an inmate such as Renda may consider her cell, and the prison as a whole, her indefinite residence and expect to remain in the

prison for an extended length of time, we do not believe those considerations are determinative of whether a prison is a dwelling for purposes of the Act. We agree with the conclusion reached by the court in *Garcia v. Condarco*, 114 F. Supp. 2d 1158, 1161 (D. N.M. 2000): "[T]here is fundamentally a distinction between a home on the one hand, and a detention facility on the other." Some facilities are designed and intended to be residential, but a prison "is designed and intended to be a penal facility." *Garcia*, 114 F. Supp. 2d at 1161. Our determination of this issue is strongly influenced by the fact that Renda has no choice in her placement at the Mt. Pleasant Correctional Facility, and freedom of choice is crucial to the purposes of the Iowa Civil Rights Act and the Fair Housing Act. Each of these Acts was intended to promote freedom of choice in housing and prohibit discrimination. *Id.* at 1162; *see also Keding*, 553 N.W.2d at 307 (noting that the housing provisions of the Iowa Civil Rights Act were patterned on the Fair Housing Act). "The element of freedom of choice is . . . paramount" and the primary purpose of the Act "has no application in the prison context." *Garcia*, 114 F. Supp. 2d at 1162. Accordingly, the purposes of eliminating discrimination in housing and promoting freedom of choice in housing are not furthered by applying the Act to inmates in a prison context, and we conclude that the ICRC correctly determined that a prison is not a "dwelling" for purposes of the Act.

**B. May an Inmate Be an "Employee"?** The Act prohibits discrimination on the basis of sex in employment. Iowa Code § 216.6. An employee is defined broadly as "any person employed by an employer." *Id.* § 216.2(6). Employer is defined as "the state of Iowa or any political subdivision, board, commission, department, institution, or school district thereof, and every other person employing employees

within the state." *Id.* § 216.2(7). Several categories of employers and employees are exempted from the discrimination prohibitions, including employers of fewer than four employees, employees who work within the employer's home, employees hired to perform personal services for the employer's family members, and bona fide religious institutions in certain situations. *Id.* § 216.6(6)(*a*)–(*d*). No explicit exception exists for inmates of correctional facilities—in fact, inmates are not mentioned at all in the statute. Given the sheer breadth of the definitions of "employee" and "employer" and the fact that the few exclusions that are identified are extremely narrow, we are inclined to start from the premise that inmates may be considered employees unless some compelling reason exists to convince us that the legislature meant to exclude them despite utilizing such expansive language.

The ICRC, relying on a 1990 opinion of the Attorney General, concluded that

> [a]n inmate is not an "employee" within the meaning of the Iowa Civil Rights Act if employed by the State or subdivision of the State but may be an "employee" within the meaning of the statute if employed through the work release or prison industry programs by employers who are otherwise subject to the Iowa Civil Rights Act.

The ICRC and the Attorney General's opinion noted that in other worker-related contexts inmates are treated differently and concluded that they should also be treated differently in the civil rights context. *See* 1990 Iowa Op. Att'y Gen. 93 (Opinion No. 90–10–3); Iowa Code § 85.59 (explicitly addressing modified workers' compensation coverage for inmates); Iowa Code § 96.19(18)(*g*)(10) (providing explicit exception to unemployment compensation coverage for inmates of correctional institutions). The ICRC contends that these explicit exceptions to other worker-related programs demonstrate that inmates are considered

differently from other groups. We, however, believe these explicit exceptions for inmates demonstrate the legislature is well aware that many inmates work within correctional settings and that certain worker-related provisions may apply to them unless they are expressly excluded or exempted. The fact that the legislature did not provide an explicit exception for inmates within the Act leads us to believe that the legislature did not intend one.

The ICRC also points to certain provisions of chapter 904 which indicate an employee-employer relationship is not created when an inmate performs work for the prison. Section 904.701 provides inmates shall be required to perform hard labor while incarcerated. Iowa Code § 904.701(1). When practicable, the director may pay the inmate "an allowance" deemed "proper in view of the circumstances, and in view of the cost attending the maintenance of the inmate. The allowance is a gratuitous payment and is not a wage arising out of an employment relationship." *Id.* § 904.701(2).[4] Section 904.901 requires the department of corrections to establish a work release program in which inmates may be granted the privilege of leaving the correctional facility and working at gainful employment. *Id.* § 904.901. When working in such a program,

> [a]n inmate employed in the community under this chapter is not an agent, employee, or involuntary servant of the department of corrections, the board of parole, or the judicial district department of correctional services while released from confinement under the terms of a work release plan. If an inmate suffers an injury arising out of or in the course of the inmate's employment under this chapter, the inmate's recovery shall be from the insurance carrier of the employer of the project and no proceedings for compensation

---

[4]This provision might be relevant to a determination of whether inmates may be considered employees entitled to fair wages under Iowa minimum wage laws or the Federal Fair Labor Standards Act. However, because Renda's claim alleges employment discrimination in violation of the Civil Rights Act, not unfair pay, we do not find this provision applicable to our analysis.

shall be maintained against the insurance carrier of the state institution, the state, the insurance carrier of the judicial district department of correctional services or the judicial district department of correctional services, and there is no employer-employee relationship between the inmate and the state institution, the board of parole, or the judicial district department of correctional services.

*Id.* § 904.906.

The ICRC contends these provisions demonstrate the legislature's intent to exclude inmates from the definition of "employee." We disagree because we do not believe the cited provisions in chapter 904 are determinative of the issue. We think the focus of section 904.701(2) is pay-related, intended to clarify the discretionary nature of the payment— that it need only be made at the director's discretion when "practicable" and should take into account the cost of the maintenance of the inmate. *Id.* § 904.701(2). In other words, an inmate working at hard labor is not entitled to earn "a fair and reasonable wage" as that concept might be defined outside the prison context.[5] The provisions explaining that an inmate employed in the community through the work release program is not an employee of the state is not inconsistent with a conclusion that an inmate *employed by the prison inside the prison* is an employee for purposes of the Act. Section 904.906 simply says that an inmate working outside the prison is an employee of that outside employer, particularly for workers' compensation purposes. It has no bearing on whether Renda may have been an employee of the prison.

Both parties cite various federal decisions interpreting Title VII, including several cases involving inmates at federal correctional facilities.

---

[5]Compare the provisions regarding payment for hard labor with the provisions addressing payment to inmates participating in the work release program. The inmate employed in the community pursuant to the work release program shall be paid a fair and reasonable wage for his work. Iowa Code § 904.905. After certain deductions are taken from the wages (for obligations such as child support, restitution, the cost of food and lodging), the balance of the wages will be held for the inmate until his release. *Id.*

Because the Act was modeled after Title VII, we find these decisions instructive, but not controlling. *Annear v. State*, 419 N.W.2d 377, 379 (Iowa 1988). The ICRC directs our attention to several federal cases concluding that an inmate is not considered an employee for Title VII purposes. *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (concluding an inmate is not an employee because his relationship with the Bureau of Prisons arises out of his status as an inmate and the primary purpose of their association is incarceration, not employment); *McCaslin v. Cornhusker State Indus.*, 952 F. Supp. 652, 657 (D. Neb. 1996) (concluding that an inmate is not an employee because the "prisoner does not enter into a bargain with the prison to become a prisoner in order to be able to work in prison industries, as might a private individual who contracts with an employer").

However, the court in *Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 128 (9th Cir. 1988), reached the opposite conclusion and determined the fact that the prison has so much control over its inmates actually weighs in favor of considering inmates employees for Title VII purposes. In that case, an inmate alleged he applied for and was denied a job in the prison library because the head librarian did not want "to work with a black man." *Baker*, 859 F.2d at 127. The court concluded Baker's claim should not have been dismissed on a motion to dismiss because "the court could not be convinced beyond doubt that no set of facts could be proven to entitle Baker to relief." *Id.* at 128. While the court did not reach the issue of whether Baker was an employee, it remanded the case for further proceedings because it was possible that an employment relationship could be established on remand. *Id.* at 129. Other courts have followed the reasoning of *Baker*, concluding the determination of whether an inmate is an employee must be made on a

case-by-case basis rather than with a per se rule. *See Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th Cir. 1994) (relying on *Baker* to conclude that inmates may be considered employees if their work can be distinguished from the obligatory on-site prison labor); *Walker v. City of Elba*, 874 F. Supp. 361, 365–66 (M.D. Ala. 1994) (relying on *Baker* to conclude that a work-release inmate was entitled to Title VII protections).

The Act was adopted "to eliminate unfair and discriminatory practices in . . . employment." 1965 Iowa Acts ch. 121 (title of act). It was designed to "correct a broad pattern of behavior rather than merely affording a procedure to settle a specific dispute." *Estabrook v. Iowa Civil Rights Comm'n*, 283 N.W.2d 306, 308 (Iowa 1979). When we consider the purposes of the Act and whether they might be achieved when applied to inmates working within a prison, we reach the same conclusion as the Seventh Circuit Court of Appeals did when explaining why Title VII might apply in the prison context, even if the Fair Labor Standards Act did not.

> Prison is in many ways a society separate from the outside world. Discrimination, however, maintains the same invidious character within the world of the prison and outside of it. Given the broad policies behind Title VII, there would appear to be no reason to withhold Title VII's protections from extending inside the prison walls.

*Vanskike v. Peters*, 974 F.2d 806, 810 n.5 (7th Cir. 1992). Accordingly, given the broad definition of "employee" utilized in the Act, and the lack of an explicit exception for inmates from the classification of "employee," along with the evils of employment discrimination the Act seeks to remedy, we conclude the legislature did not intend to exclude inmates from protection against discrimination in employment within the prison.

Our conclusion does not mean that all work performed by an inmate will constitute employment. We agree with the *Baker* court's

implicit holding that the determination of whether an inmate is an employee will need to be reached on a case-by-case basis, with a consideration of various factors, including the voluntariness of the position, whether the inmate went through an application process, and the nature and extent of similarities between the circumstances of the inmate's job in the prison and jobs outside the penal context.

To assist in determining the similarities between jobs inside and outside the prison, we think it may also be useful to consider how other courts have distinguished between employees and independent contractors for purposes of Title VII. The Eighth Circuit Court of Appeals has explained that when confronted with the issue, "nearly every appellate court has applied a test described as a hybrid of the common-law test and economic realities test."[6] *Wilde v. County of Kandiyohi*, 15 F.3d 103, 105 (8th Cir. 1994). "Under the hybrid test, the term 'employee' is construed in light of general common-law concepts, taking into account the economic realities of the situation." *Id.* The hybrid test has been described as an

> application of general principles of the law of agency to undisputed or established facts. Consideration of all the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law . . . . If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

---

[6]The common-law test was first set forth in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989), and the economic realities test was developed in a Fair Labor Standards Act case, *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961). *See Moland v. Bil-Mar Foods*, 994 F. Supp. 1061, 1068 (N.D. Iowa 1998).

*Spirides v. Reinhardt*, 613 F.2d 826, 831–32 (D.C. Cir. 1979) (footnotes omitted).

> Additional factors relevant for consideration include
>
> (1) The kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 832.

Although Renda has not asserted a workers' compensation claim in this case, this court has addressed the standard for determining whether a worker is employed for purposes of chapter 85 of the Iowa Code.[7] We have concluded the major factors considered in determining whether an employer-employee relationship exists in the workers' compensation context are whether the party alleged to be the employer (1) is the "responsible authority in charge of the work or for whose benefit the work is performed," (2) has the right to select, "or to employ at will," (3) has a responsibility for payment of wages, (4) has "the right to discharge or terminate the relationship," and (5) has "the right to control the work." *Sister Mary Benedict v. St. Mary's Corp.*, 255 Iowa 847, 851–52, 124

---

[7]As Renda has not made a claim based on Iowa Code chapter 85, we do not address the provisions of Iowa Code section 85.59 detailing the circumstances in which inmates may receive workers' compensation benefits. We cite our decisions detailing the standard for determining whether an employer-employee relationship exists in the workers' compensation context not because that standard is controlling in this case, but to emphasize its similarity with the standard applied in the Title VII cases cited above.

N.W.2d 548, 551 (1963); *see also Henderson v. Jennie Edmundson Hosp.*, 178 N.W.2d 429, 431 (Iowa 1970).

Although a few of the factors considered in determining whether an employer-employee relationship exists in the Title VII and workers' compensation contexts may not be applicable in the prison setting, we think most of them are useful and relevant in assessing the similarities between jobs inside and outside the prison, and in determining whether an inmate claiming a violation of chapter 216 is an employee protected under the Act.

Although Renda asserts on appeal that the circumstances of her prison job bring her comfortably within the definition of "employee," because the ICRC refused to entertain jurisdiction over her claim, the record does not contain evidence sufficient to allow us to address the issue on appeal.[8] Accordingly, we conclude that inmates may be employees for purposes of the Act and the ICRC committed legal error in concluding it had no jurisdiction over Renda's complaint.

### IV. Conclusion.

We affirm the determination of the district court that the ICRC did not err in determining that the housing provisions of the Act do not apply to inmates housed in a correctional facility. We conclude the ICRC erred in deciding as a matter of law that an inmate could not be considered an employee for purposes of the Act. We therefore affirm in part and reverse

---

[8]Renda's complaint merely states that she "started working as a R&D (Receiving & Discharge) Clerk" and does not provide any background on her application process or whether she was required to work in that position. Later, after she was terminated from the R&D position, she states she "was denied a job at the Recreation Department because of the [property sheet forging] incident." This allegation implies she may have gone through an application process for the second job, but we still believe the record must be developed.

in part the district court's judgment and remand to the district court for remand to the ICRC for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except Cady, J., who dissents, and Appel, J., who takes no part.

**CADY, Justice (dissenting).**

I respectfully dissent from that portion of the holding of the majority declaring a prison inmate is an employee of the State of Iowa entitled to seek relief under the Iowa Civil Rights Act from discriminatory practices while performing a regularly assigned prison job when various factors used to distinguish employees from independent contractors militates in favor of a finding that the inmate is an employee. This holding is contrary to the position of the Iowa Civil Rights Commission, as well as the interpretation of related federal laws by the Equal Employment Opportunity Commission, the Department of Labor, and nearly every court in the nation that has addressed the application of the Fair Labor Standards Act to prisoners who work in state prison industries. *See McCaslin v. Cornhusker State Indus.*, 952 F. Supp. 652, 656–58 (D. Neb. 1996) (noting that a majority of jurisdictions, along with the EEOC and Department of Labor, do not consider prisoners employees). Moreover, the majority's holding is unfaithful to the principles of statutory interpretation we are obligated to apply when we declare the statutory intent of our legislature. *See Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 713 (Iowa 2005) (recognizing we apply the rules of statutory construction to attain our goal of interpreting statutes according to the intent of the legislature). I would affirm the decision of the district court and conclude the legislature did not intend for prison inmates who, like Renda, perform regular prison labor to be included within the provisions of Iowa's civil rights act relating to unfair or discriminatory practices in the workplace.

At the outset, I acknowledge discrimination exists in prisons as it still does in society in general. Moreover, a prison setting in no way

excuses the presence of discrimination. Yet, the question is not whether the overarching policies behind the enactment of Iowa's civil rights act pertaining to employment discrimination apply to prisons, but whether the legislature intended for the provisions to apply to prisoners engaged in regularly assigned labor. The majority has failed to properly analyze this question and, accordingly, has answered it incorrectly.

The majority first rejects the Iowa Civil Rights Commission's interpretation by finding the legislature did not give the commission the power to interpret the meaning of an "employee" under the act. Yet, this conclusion simply aligns the standard of judicial review on appeal. The majority may not be required to give the commission's interpretation deference, but courts may nevertheless utilize all agency interpretations as a helpful tool in conducting independent analysis. *See PanDa Eng'g v. Eng'g & Land Surveying Examining Bd.*, 621 N.W.2d 196, 198 (Iowa 2001) (recognizing we give weight to an agency's statutory interpretation "in areas of the agency's expertise"). The majority proceeded to substitute its judgment for that of the commission without pausing to give any thought to the commission's interpretation.

More importantly, the majority builds its decision on two false premises that have no foundation in law or logic. These false premises are responsible for the majority's faulty conclusion. The majority begins its analysis with the premise that the word "employee" is a broad term and, therefore, must include prison inmates unless there is a "compelling reason" to the contrary. This homespun principle has no support in the law and is totally contrary to our long-standing rule of statutory interpretation that, when a statute does not provide a helpful definition of a disputed term, courts should not imply a meaning that is broader than the common-law definition. *See Nationwide Mut. Ins. Co. v. Darden,*

503 U.S. 318, 322–23, 112 S. Ct. 1344, 1348, 117 L. Ed. 2d 581, 588–89 (1992) (applying test to the term "employee"); *see also Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 685 (Iowa 2001) ("[W]e construe statutory language consistent with our case law and the common law . . . . Words that have a well-defined meaning in the common law have the same meaning in statutes dealing with similar subject matter." (Citations omitted.)). Furthermore, this approach reveals our legislature did not intend to include prison inmates as employees under Iowa Code chapter 216. *See Frederick v. Men's Reformatory*, 203 N.W.2d 797, 798 (Iowa 1973) (holding inmates are not "employees" under the workers' compensation statute). The majority totally ignores the common-law context and, from that point, sets course on its misguided path of a "compelling reason" to exclude.

The majority next declares, again, without any authority, that the absence of a statutory exception for prison inmates in chapter 216 signals that the legislature intended to include prison inmates within the parameters of chapter 216. This premise totally misses the point of our applicable rules of interpretation and sinks an already distressed analysis.

Under our principles of statutory interpretation, an exception to a statute created by the legislature normally indicates the matter excepted would have been included in the statute absent the exception. *River Bend Farms, Inc. v. M & P Mo. River Levee Dist.*, 324 N.W.2d 460, 462 (Iowa 1982); *see also* 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 47:11, at 333 (7th ed. 2007) (stating the general rule that "statutory exceptions exist only to exempt something which would otherwise be covered"). However, the absence of an exception for a particular matter in a statute, as in this case, does not

present the same inference. The absence of an exception may simply signal that the legislature never considered the matter to be covered under the statute in the first place. For example, in 1973, we held the workers' compensation statute applicable to employees in this state did not include prison inmates working in prison industries, even though they were not specifically excluded from the statute. *Frederick*, 203 N.W.2d at 798. We found the relationship between the state and its prisoners were, in fact, "the antithesis of voluntary employment," and inmates were not included in the statute because they were not employees. *Id.* Subsequently, the legislature amended the workers' compensation statute to provide for limited workers' compensation coverage for inmates engaged in special work such as services rendered under a chapter 28E agreement, services rendered for private industry maintained in the prison or under section 904.809, and certain other special work assignments and projects. *See generally* Iowa Code § 85.59 (2009) (providing benefits for certain specified inmates). Thus, the special statutory inclusion of inmates performing certain jobs confirmed our legislature's intent not to generally include inmates in the statute.

Under our accepted rules of interpretation, we must accept that our legislature does not include inmates in matters relating to employment without special rules for inclusion. The approach of the majority is contrary to the weight of our rules of interpretation and the clear intent of our legislature.

Lastly, the majority places a great amount of emphasis on the *Baker* case. *Baker v. McNeil Island Corr. Ctr.*, 859 F.2d 124 (9th Cir. 1988). The holding is a minority position, and the case can be distinguished from this case because it dealt with a voluntary work assignment.

Notwithstanding, the multifactor test ultimately adopted by the majority is misplaced as a means to decide if inmates performing mandated labor within the walls of a prison for no wage are employees. *See* Iowa Code § 904.701 (indicating all inmates are required to perform labor and providing rules for paying inmates "gratuitous allowances" for services rendered to prison). The test focuses primarily on control, which is the very point of incarceration. Incarceration provides the ultimate control. In fact, incarceration provides so much control that an inmate performing regular work, like Renda, could never become an employee. *See Vanskike v. Peters*, 974 F.2d 806, 810 (7th Cir. 1992) ("In those cases the question is essentially whether there is *enough* control over the individual to classify him as an employee. But here . . . there is obviously enough control over the prisoner; the problematic point is that there is *too much* control to classify the relationship as one of employment."). As we recognized in *Frederick*, an inmate is the antithesis of a voluntary employee. 203 N.W.2d at 798.

The majority has analyzed the issue in this case without following our rules of interpretation and has reached a conclusion that is clearly contrary to the intent of our legislature. For that reason, I respectfully dissent. Our role of interpreting statutes is too important to take the approach followed by the majority.