# IN THE SUPREME COURT OF IOWA

No. 16–1146

Filed March 10, 2017

**EUGENE J. KOPECKY,**

Appellant,

vs.

**IOWA RACING AND GAMING COMMISSION,**

Appellee.

---

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

A citizen appeals a district court judgment affirming the Iowa Racing and Gaming Commission's declaratory order. **AFFIRMED.**

Eugene J. Kopecky of Ackley, Kopecky & Kingergy, L.L.P., Cedar Rapids, pro se appellant.

Thomas J. Miller, Attorney General, David M. Ranscht and Jeffrey C. Peterzalek, Assistant Attorneys General, for appellee.

**WIGGINS, Justice.**

A citizen appeals from the district court's ruling on judicial review. The district court affirmed the Iowa Racing and Gaming Commission's declaratory order in which the Commission used its rules to conclude that its authority under Iowa Code chapter 99F permits it to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license. On appeal, we hold the rule allowing the Commission to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license is not "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law" under section 17A.19(10)(*b*) (2015).

## I. Background Facts and Proceedings.

In March 2013, the citizens of Linn County approved a referendum to permit gambling games in the county. Soon thereafter, an organization in Linn County applied to the Commission for a license to operate a new gambling structure. The Commission ordered two independent market feasibility studies, and both studies concluded the casino market in Iowa was not underserved, and a new casino would cannibalize revenue from existing gambling facilities. Relying on the market studies and citing the significant economic impact granting a new gambling license could have on existing facilities, the Commission denied the organization's application in April 2014.

On March 9, 2015, Eugene Kopecky, a resident of Linn County, filed a petition for declaratory order with the Commission. Kopecky was not associated with the organization whose application for a license was denied in 2014. In his petition, he stated he "plans to file an application with the [Commission] to secure a gambling license to conduct gambling

games in a licensed gambling structure in Linn County, Iowa." However, he believed it would "serve no purpose for [him] to file an application for a license" because the Commission denied a previous application due to "the negative impact on existing license holders in other Iowa counties."

Kopecky contended the Commission's consideration of that factor in denying an application is "contrary to Chapter 99F of the Iowa Code" and that it is necessary to determine the proper meaning and construction of the Code as it relates to issuing a gaming license when the residents of a county have approved a gambling referendum. Thus, Kopecky asked the Commission to answer two questions:

Question Number One:

> Whether or not the [Commission] can use the existence of a gambling license in one county, or the impact on an existing gambling license in one Iowa county, when considering whether or not to issue a gambling license in another (different) Iowa county?

Question Number Two:

> If the [Commission] has adopted administrative rules that are contrary to Chapter 99F of the Iowa Code are those administrative rules null and void?

He asserted the answer to question one is no, and the answer to question two is yes.

On April 9, the Iowa Gaming Association (IGA), an association comprised of eighteen existing gambling licensees, intervened in the declaratory order proceedings because the answers to Kopecky's questions would affect the existing licensees. In its brief in support of its petition for intervention, the IGA asserted that the Commission has broad powers to regulate all gambling operations under Iowa Code chapter 99F and that Kopecky misinterpreted the Code as well as the

Commission's rules. After hearing oral argument from Kopecky and the IGA at its June meeting, the Commission announced its decision.

The Commission answered Kopecky's first question in the affirmative, concluding Iowa Code chapter 99F and the administrative rules "allow and/or require" it to consider the impact on an existing casino in one county when considering whether or not to issue a gambling license in another county. With respect to Kopecky's second question, the Commission determined it did not have jurisdiction to answer the question, as it is within the court's purview to determine whether an administrative rule is null and void. The Commission subsequently filed a written declaratory order memorializing the decision it announced at the meeting.

Kopecky sought judicial review. He requested the district court find the Commission's ruling regarding the criteria it may consider in licensure decisions was in error. Kopecky also requested the district court hold any administrative rule of the Commission that is contrary to chapter 99F null and void. The district court affirmed the Commission's declaratory order in its entirety. On this appeal, Kopecky only challenges the district court ruling regarding question one.

## II. Issue.

We must decide whether the Commission can enact a rule allowing it to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license.

## III. Scope of Review.

Iowa Code section 17A.19(10) governs judicial review of an agency action. *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). "The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner and if the agency

action meets one of the enumerated criteria contained in section 17A.19(10)(*a*) through (*n*)." *Id.* In reviewing the decision of the district court, we must apply the standards set forth in Iowa Code section 17A.19(10) to determine whether we reach the same result as the district court. *Auen v. Alcoholic Beverages Div.,* 679 N.W.2d 586, 589 (Iowa 2004).

Although the legislature has granted the Commission broad rulemaking authority, we are not firmly convinced the legislature vested the Commission with the authority to interpret our statutes when it enacts its rules. *See Renda,* 784 N.W.2d at 13. Accordingly, we will overturn the Commission's rule allowing it to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license if the rule is "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law." Iowa Code § 17A.19(10)(*b*).

## IV. Discussion and Analysis.

The Iowa legislature has vested the Commission with broad authority to regulate gambling operations in our state. *Alfredo v. Iowa Racing & Gaming Comm'n,* 555 N.W.2d 827, 831 (Iowa 1996) ("The legislature has empowered and obligated the commission to regulate all gambling operations governed by Iowa Code chapter 99F . . . and to adopt rules pursuant to that mandate."); *see also* Iowa Code § 99F.4. The Commission has supervisory authority and "full jurisdiction over" all gambling operations governed by chapter 99F. Iowa Code § 99F.4.

At issue in this case are two specific powers the legislature conferred on the Commission: first, the power "[t]o license qualified sponsoring organizations," and second, the power "[t]o investigate applicants and determine the eligibility of applicants for a license and to

select among competing applicants for a license the applicant which best serves the interests of the citizens of Iowa." *Id.* § 99F.4(1)–(2). To enforce these powers, the Commission must "adopt rules pursuant to chapter 17A." *Id.* § 99F.4. It also has the power "[t]o take any other action as may be reasonable or appropriate to enforce [chapter 99F and the Commission's rules]." *Id.* § 99F.4(13).

Under chapter 99F, the Commission has the exclusive authority to issue licenses. The Code contains several criteria applicants must meet to demonstrate eligibility for a license. *See, e.g.*, *id.* §§ 99F.6, .7(8). The Commission "shall issue a license for a period of not more than three years" only if it is "satisfied that this chapter and its rules . . . have been or will be complied with." *Id.* § 99F.7(1). The Commission has also adopted a rule containing seven criteria it considers when granting a license. Iowa Admin. Code r. 491—1.7. Ultimately, the legislature gave the Commission the authority to "decide the *number*, *location*, and type of gambling structures and excursion gambling boats licensed under this chapter." Iowa Code § 99F.7(1) (emphasis added).

Kopecky first asserts the Code confers duties on the Commission to "assure that every Iowa county that does not want gambling is free from gambling," and "assure that every Iowa county that wants to have gambling shall have gambling . . . under the direct supervision and regulation of the commission." In other words, he contends that once voters approve a gambling games referendum, the Commission must issue a license to a qualified applicant and cannot enact a rule with other criteria to deny a license to an applicant. However, the clear and unambiguous language of section 99F.7(11) makes Kopecky's assertion untenable. *See ABC Disposal Sys., Inc. v. Dep't of Nat. Res.*, 681 N.W.2d 596, 603 (Iowa 2004) ("If the statute's language is clear and

unambiguous, we apply a plain and rational meaning consistent with the subject matter of the statute.").

Prior to the Commission issuing a license for a gambling structure in a particular county, the electorate must approve a referendum to permit gambling games in the county. The Iowa Code provides,

> A license to conduct gambling games in a county shall be issued only if the county electorate approves the conduct of the gambling games as provided in this subsection. . . . If a majority of the county voters voting on the proposition favor the conduct of gambling games, the commission *may* issue one or more licenses as provided in this chapter. If a majority of the county voters voting on the proposition do not favor the conduct of gambling games, a license to conduct gambling games in the county *shall* not be issued.

Iowa Code § 99F.7(11)(*a*) (emphasis added).

"When the term 'shall' appears in a statute, it generally connotes the imposition of a mandatory duty." *Ramirez-Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 771 (Iowa 2016). When the legislature uses the term "may" in a statute, it is usually permissive. *Iowa Nat'l Indus. Loan Co. v. Iowa State Dep't of Revenue*, 224 N.W.2d 437, 440 (Iowa 1974). Additionally, the Iowa Code contains rules of statutory construction, which provide that in statutes enacted after July 1, 1971, the word "shall" imposes a duty, and the word "may" confers a power, unless otherwise specified by the legislature. Iowa Code § 4.1(30).

Given the proximity of the words "may" and "shall" in section 99F.7(11)(*a*), we conclude the intent of the legislature could not have been for "may" to mean the same thing as "shall." If the legislature intended to impose a duty on the Commission to issue a license following an affirmative referendum, it would have used the word "shall," as it did to impose a duty on the Commission to not issue a license to conduct

gambling games in a county in which the majority of voters disapprove a referendum for gambling games.

Accordingly, we disagree with Kopecky and conclude the Commission has the power to issue a license following an affirmative gambling games referendum, but is not required to do so.

Kopecky's second assertion is the Commission could not enact a rule allowing it to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license. The rule the Commission uses to decide whether it grants or denies a gaming license lists seven criteria the Commission considers. Iowa Admin. Code r. 491—1.7.

One criterion of the rule requires the Commission to consider the economic impact a new gambling operation might have on existing gambling facilities. *Id.* r. 491—1.7(3). The rule provides, in relevant part,

> *Economic impact and development.* The commission will consider:
>
>     *a.* The amount of revenue to be provided by the proposed facility to the state and local communities through direct taxation on the facility's operation and indirect revenues from tourism, ancillary businesses, creation of new industry, and taxes on employees and patrons. The commission may engage an independent firm proficient in market feasibility studies in the industry for specific analysis of any application to determine the potential market of any proposed facility as well as the impact on existing licensees.
>
>     . . . .
>
>     *c.* The viability and overall net benefit of the proposed operation to the state gaming industry, taking into consideration:
>
>     . . . .

(2) Impact on existing operators' adjusted gross revenue versus existing operators' ratio of adjusted gross revenue to investment.

. . . .

(4) Percent of projected adjusted gross revenue from underserved markets.

(5) Percent of projected adjusted gross revenue from existing Iowa operators.

. . . .

*d.* The benefits to Iowa tourism.

*e.* The number and quality of employment opportunities for Iowans.

*f.* The development and sale of Iowa products.

*Id.* We disagree with Kopecky's second assertion.

In our review of chapter 99F, we find it replete with provisions indicating the legislature's intent that the Commission can consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license. First, the Commission issues licenses to qualified sponsoring organizations to conduct gambling games. Iowa Code § 99F.5(1). The legislature requires a qualified sponsoring organization to distribute "at least three percent of the adjusted gross receipts for each license year" "for educational, civic, public, charitable, patriotic, or religious uses." *Id.* § 99F.5(1). The legislature's requirement that the qualified sponsoring organizations distribute funds back into the community, rather than taking the funds as profit, evidences a legislative intent that the economic impact and development on the state is an important function of legalized gambling in Iowa.

Second, the legislature has recognized that having too many gambling establishments is not consistent with the intent to provide

economic development funds to grow the Iowa economy. One section of the Code prohibits the establishment of a gaming facility in Polk County. *Id.* § 99F.4C. We perceive the purpose of this section was to protect Prairie Meadows Racetrack and Casino, an established facility in Polk County. Another provision of the Code protects counties with racetracks from competition by excursion boats unless the excursion boats can meet certain legislative conditions. *Id.* § 99F.7(2)(*b*). These Code provisions also evidence a legislative intent that the legislature does not want a new gambling facility to cannibalize an existing gambling facility because the economic impact on an existing facility is an important aspect of furthering economic development in this state.

Third, gambling facilities are required to promote the development of the Iowa economy. The Code requires an excursion gambling boat to use "Iowa resources, goods and services in the operation" of the facility. *Id.* § 99F.7(5). The Code also mandates "[a]n applicant shall make every effort to ensure that a substantial number of the staff and entertainers employed are residents of Iowa" and "[a] section is reserved for promotion and sale of arts, crafts, and gifts native to and made in Iowa." *Id.* § 99F.7(6)(*a*)–(*b*). Finally, the Code sets a special minimum wage for gambling facility workers. *Id.* § 99F.7(7). These sections also indicate a legislative intent that the economic impact of a new facility on an existing facility is an important aspect of furthering economic development.

In summary, one of the reasons the gaming industry exists in Iowa is to further the economic development of the community in which the facility is located, which in turn affects the state as a whole. In order to insure the continued economic development of our state, the legislature and the Commission deem it important to make sure an existing gambling facility remains viable when the Commission issues a new

license. A closed gambling facility, together with a loss of jobs, has an adverse effect on economic development in our state.

Accordingly, the Commission's consideration of the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license is not "beyond the authority delegated to the agency by any provision of law or in violation of any provision of law" and does not violate Iowa Code section 17A.19(10)(*b*).

## V. Disposition.

We affirm the judgment of the district court affirming the Commission's declaratory order in its entirety. We reach this conclusion because the rule allowing the Commission to consider the economic effect of a new gaming operation on existing gaming facilities when deciding whether to issue a new gaming license is not "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law" under section 17A.19(10)(*b*).

**AFFIRMED.**

All justices concur except Hecht and Zager, JJ., who take no part.