# IN THE SUPREME COURT OF IOWA

No. 17–0686

Filed April 27, 2018

**CITY OF DES MOINES, IOWA,**

**CITY OF MUSCATINE, IOWA,**

and

**CITY OF CEDAR RAPIDS, IOWA,**

Appellants,

vs.

**IOWA DEPARTMENT OF TRANSPORTATION**
and **IOWA TRANSPORTATION COMMISSION,**

Appellees.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Three cities appeal a district court order upholding administrative rules issued by the Iowa Department of Transportation. **REVERSED AND REMANDED.**

Michelle R. Mackel-Wiederanders and Carol J. Moser, Des Moines, Douglas A. Fulton, Matthew S. Brick, and Erin M. Clanton of Brick Gentry, P.C., West Des Moines, Elizabeth D. Jacobi and James H. Flitz, Cedar Rapids, for appellants.

Thomas J. Miller, Attorney General, David S. Gorham, Special Assistant Attorney General, and Richard E. Mull, Assistant Attorney General, for appellees.

**MANSFIELD, Justice.**

We must determine whether the Iowa Department of Transportation (IDOT) had the statutory authority to promulgate administrative rules regulating automated traffic enforcement (ATE) systems located along primary roads. *See* Iowa Admin. Code ch. 761—144 (2014). The enforcement of these rules resulted in three cities being ordered to relocate or remove several of their ATE cameras.

The issue presented is the reach of the administrative state: Before the executive branch can adopt a rule with the force and effect of law, how much groundwork must be laid by the legislative branch? After all, article III, section 1 states that "[t]he legislative authority of this state shall be vested in a general assembly . . ."—not the executive branch. Iowa Const. art. III, § 1. Article III, section 1 also states that "no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted." *Id.*

On our review, we find that the IDOT did not have authority from the legislature to issue rules regulating ATE systems. The IDOT's specific grants of authority are in other areas and do not support the rules. Moreover, any general authority over "regulation and improvement of transportation" is too broad to sustain the rules—particularly in light of the specific grants of authority in other areas. *See* Iowa Code § 307.2 (2013). Accordingly, we conclude the rules are invalid and cannot be enforced against the cities. Therefore, we reverse the judgment of the district court and remand for further proceedings.

## I. Facts and Procedural Background.

This dispute is between the IDOT and three cities—Cedar Rapids, Des Moines, and Muscatine (the Cities). The Cities have installed ATE

systems on primary roads within their boundaries.[1] The IDOT has sought to regulate and limit those ATE systems through administrative rules.

**A. The Installation of the Cities' ATE Systems.** Until 2014, the IDOT had no formal rules governing ATE systems but instead relied on informal guidelines. In 2010, working within these guidelines, Cedar Rapids obtained the IDOT's written agreement that the city could install ATE equipment. Cedar Rapids placed these systems in various locations within its city limits. These places included Interstate 380 and 1st Avenue East at the intersection of 10th Street. Both I-380 and 1st Avenue East are considered primary roads.

Early in 2011, Muscatine also obtained the IDOT's written agreement to install ATE equipment within its limits, following a study of accident data and speeding and red-light surveys. The locations included two intersections along Highway 61, a primary road.

Later that year, Des Moines also received IDOT's agreement that it could install ATE cameras to monitor red-light running and speeding. These included an ATE system to detect speeding vehicles traveling eastbound on Interstate 235, between 42nd Street and Polk Boulevard. I-235 is also a primary road. The specific location on I-235 was chosen because of traffic flow, highway grade, and layout, which the city maintained made it more difficult for officers to monitor speed safely from their patrol cars.

---

[1]ATE systems use automated cameras to record motorists who commit traffic violations, such as speeding or running a red light. After the vehicle and its license number have been photographed, a citation is sent to the registered owner of the vehicle. *See, e.g.*, Des Moines, Iowa, Code of Ordinances § 114-243 (2018). Typically, only a fine is charged. *See, e.g., id.* There is no effect on the motorist's driving or insurance record, and it is only a civil infraction. Also, the ATE systems generally result in a speeding citation only when the motorist is driving a certain threshold amount above the speed limit—such as more than ten miles per hour above the limit. *See, e.g.*, Muscatine, Iowa, City Code § 7-5-5 (2018).

IDOT's standard agreements—which each of the Cities executed—stated that the agency reserved the right to "[r]equire the removal of such traffic control device upon thirty days' written notice.  Either lack of supervision, inadequate enforcement, unapproved operation, or intolerable congestion shall be considered sufficient reason to require removal."

**B. The IDOT's Rulemaking.**  On October 2, 2013, the IDOT commenced a rulemaking proceeding to regulate and restrict ATE placement and usage on primary roadways.  *See* Iowa Code § 17A.4.  In accordance with requirements of the Iowa Administrative Procedures Act, the IDOT published proposed rules and accepted written comments on them.  *See id.* § 17A.4(1)(*a*)–(*b*).

Among other things, the proposed rules provided that ATE systems "shall only be considered after other engineering and enforcement solutions have been explored and implemented," "should not be used as a long-term solution for speeding or red-light running," and "should only be considered in extremely limited situations on interstate roads because they are the safest class of any roadway in the state and they typically carry a significant amount of non-familiar motorists."  Notice of Intended Action, Admin. Rules Review Comm. 1037C (IDOT Oct. 2, 2013), https://www.legis.iowa.gov/docs/aco/arc/1037C.pdf.  The proposed rules also required advance approval by the IDOT and a detailed "justification report" for any ATE system.  Thereafter, localities would be required to submit detailed annual evaluations to assist the IDOT in reevaluating each ATE system and deciding whether to allow its continued use.

Many comments were submitted expressing sharply divergent viewpoints.[2] Most commenters did not discuss the actual rules but addressed the pros and cons of ATE systems generally. For example:

> "I strongly support the use of traffic cameras in Cedar Rapids—specifically on I380. They are working!"

> "In general, I am against the indiscriminate use of 'spy cameras' as a means to collect massive fines from drivers."

> "I like the idea of traffic cameras for speeding and red lights. I believe they do help to sa[v]e lives."

> "I am in total agreement of getting rid of photo enforced speed cameras in Iowa. It is an invasion of privacy. Thank you for using common sense on this issue."

> "I welcome *fewer* restrictions on the installation of speed and red-light cameras. It's the easiest way to keep drivers honest and legal. And that's good for everyone."

> "I am totally against traffic cameras and think they should be outlawed."

> "Anything to get people to obey traffic laws is a good thing, even if it is unpopular. Calling the cameras distracting to drivers just to get rid of them is a cheap shot. KEEP THE CAMERAS."

> "I see ABSOLUTELY NO value in traffic cameras placed on the highway."

Some commenters offered more specific suggestions. One commenter urged that

> [s]peed cameras should not be placed where there is a sudden reduction in the speed limit. It is dangerous to have a speed sign reducing speed a short distance from the camera. The locals know to reduce their speed and start slamming on [their brakes], which is not safe for traffic.

Along the same lines, another commenter recommended "that the Department additionally restrict ATEs' placement in locations where a higher speed zone is transitioning to a lower speed zone." Yet another

---

[2]The IDOT received a total of 164 written comments.

commenter proposed that ATE systems "[n]ot be placed within 1,000 feet of either side of a posted speed limit sign."

On October 30, the IDOT held a public hearing to afford interested persons an opportunity to speak out on the proposed rules. At the hearing, representatives of the Cities, in addition to other officials and members of the public, made oral presentations. A total of thirteen persons spoke.

Again, the subject of limiting the use of speed cameras within a certain distance of new speed limits came up. For example, one speaker expressed concerns about municipalities installing ATE systems "in areas where the speed is going from a faster speed zone to a slower speed zone . . . because those are areas where more people are likely to slam on their brakes, and it would be . . . more dangerous."

The IDOT held a subsequent meeting on December 10 to present the final rules and detail the feedback it had received throughout the process. At this time, the IDOT unveiled modifications to the rules. These included a "1000-foot rule"—i.e., that ATE equipment could not be stationed within 1000 feet of a speed limit change. The IDOT explained that this modification was in response to prior comments.

In most other respects, the final rules mirrored the initial rules the IDOT had proposed in October. Thus, all ATE locations on the primary road system had to be approved by the IDOT. Iowa Admin. Code r. 761—144.4(3). The final rules contained a requirement that any "local jurisdiction requesting to use an automated traffic enforcement system on the primary road shall provide the department a justification report." *Id.* r. 761—144.5(1). Such report needed to include documentation as to "why the area is a high-crash or high-risk location." *Id.* r. 761—144.5(1)(*a*). According to the rules, ATE systems "should only be considered in

extremely limited situations on interstate roads because they are the safest class of any roadway in the state and they typically carry a significant amount of non-familiar motorists." *Id.* r. 761—144.4(1)(*c*). After the ATE equipment was installed, the rules required "each local jurisdiction with active automated enforcement on Iowa's primary highway system [to] evaluate the effectiveness of its use" on an ongoing basis. *Id.* r. 761—144.7(1). The annual evaluation must

> (1) Address the impact of automated enforcement technology on reducing speeds or the number of red-light running violations for those sites being monitored.

> (2) Identify the number and type of collisions at the sites being monitored, listing comparison data for before-and-after years. If the system includes intersection enforcement, only the monitored approaches should be included in the evaluation.

> (3) Evaluate and document the automated traffic enforcement system's impact on addressing the critical traffic safety issue(s) listed in the justification report if a justification report was part of the system's initial approval process.

> (4) Provide the total number of citations issued for each calendar year the system has been in operation.

> (5) Certify that the calibration requirements of subrule 144.6(4) have been met.

*Id.* r. 761—144.7(1)(*a*).

The IDOT would determine whether use of the ATE system would continue. *Id.* r. 761—144.8. "Continued use [would] be contingent on the effectiveness of the system, appropriate administration of it by the local jurisdiction, the continued compliance with these rules, changes in traffic patterns, infrastructure improvements, and implementation of other identified safety countermeasures." *Id.* r. 761—144.8(1). Additionally, the department explicitly "reserve[d] the right to require removal or

modification of a system in a particular location, as deemed appropriate." *Id.* r. 761—144.8(2). The rules became effective February 12, 2014.

**C. The IDOT's Subsequent Directives to Remove Certain ATE Systems.** Once the ATE rules became effective, each city submitted an evaluation to the IDOT in an effort to justify the continued presence of the cameras. Cedar Rapids provided crash data showing that crashes at 1st Avenue and 10th Street had remained roughly constant since the installation of the ATE systems. However, on I-380 there had been declines both in overall crashes and, especially, personal injury crashes. Whereas one fatal crash had occurred in 2008 and two in 2009, no fatal crashes had occurred in the relevant area of I-380 since the ATE cameras were installed.

Muscatine reported that totaling the five intersections where ATE equipment had been installed, crashes had declined significantly overall. In 2010, there had been thirty-four motor vehicle crashes including nine injury crashes; by contrast, during the year 2013, there had been nineteen crashes, of which four were injury crashes.

Des Moines's report also argued that its ATE systems had had a positive safety impact. Regarding the I-235 location, the report concluded that "the total number of accidents on I-235 in this area (4700 block to 4200 block) have decreased since the implementation of our camera program."

Nonetheless, the IDOT ordered all of the Cities to disable or move some of their ATE equipment. Cedar Rapids was told to disable its ATE speed detection system at the intersection of 1st Avenue and 10th Street because it violated the 1000-foot rule. The IDOT also told Cedar Rapids to move, remove, or disable its ATE cameras on I-380 either because of the 1000-foot rule or because "[t]he location of the camera is well beyond the

'S' curve [on I-380] and therefore beyond the area of concern." The IDOT further cited Iowa Administrative Code rule 761—144.4(1)(*c*) regarding the limited use of ATE systems on interstate roadways.

Muscatine was ordered to remove its ATE camera from Highway 61 at University because it violated the 1000-foot rule, because there were a high number of citations, and because crashes had increased at this particular location since the camera was installed.

The IDOT directed Des Moines to remove its ATE camera from I-235 as well. Although it acknowledged a reduction in crashes since the camera was activated, it pointed to its own rule that ATE should only be considered in extremely limited situations on interstate highways and observed that "[t]his location experiences a low crash rate." It also noted the high number of citations.

Each city appealed, and the department director upheld each decision.

**D. The Consolidated Petition for Judicial Review.** On June 9, 10, and 11, 2015, Des Moines, Muscatine, and Cedar Rapids respectively filed separate petitions for judicial review under Iowa Code chapter 17A. These actions challenged the IDOT's actions on various grounds, including (1) infringement of the Cities' home rule authority; (2) lack of statutory authority for the IDOT to promulgate the rules; (3) a claim that the IDOT did not follow proper procedure in promulgating the rules, especially because the original, proposed rules had not contained a 1000-foot rule; and (4) a claim that the IDOT's directives under the rules to remove or disable specific ATE equipment were arbitrary and capricious. The actions were later consolidated into a single proceeding in the Iowa District Court for Polk County.

On March 27, 2017, the district court held a hearing, and the court subsequently issued an order on April 25.

The district court's order upheld both the IDOT's rules and its decisions based on those rules. In dismissing the Cities' home rule argument, the court noted, "Pursuant to Section 306.4(1), the IDOT implemented rules governing the minimum requirements for ATEs, their evaluation, and their subsequent removal if necessary. Iowa Admin. Code r. 761—144. Therefore, state law, through the IDOT administrative rules, controls."

The court also found that the IDOT had sufficient authority under the Iowa Code to promulgate the subject ATE rules. It stated,

> The "jurisdiction and control over the primary roads shall be vested in the [IDOT]." [Iowa Code] § 306.4(1). To carry out these statutory provisions, the IDOT adopted rules regulating ATEs emphasizing safety. *See* Iowa Admin. Code r. 761—144.6(1). This is consistent with regulating obstructions in highway right-of-ways; the construction, improvement, operation or maintenance of any highway; and limiting cities' obstruction of a street or highway which is used as an extension of a primary road. *See* Iowa Code Chapter 318; Iowa Code §§ 306.4, 321.348.

(First alteration in original.)

The district court further concluded that the rules had been promulgated in accord with a proper procedure, noting,

> At the meetings and during the public hearing, comments specifically citing the 1,000ft rule were submitted. Therefore, the 1,000ft rule is a direct result of public comments made and is, at the very least, a logical outgrowth of overall public comments. Since final administrative rules may differ from proposed rules, an additional notice and comment period is not required and the IDOT decisions and orders pursuant to the rule are valid.

Finally, the district court concluded that the application of the rules to the Cities' ATE systems complied with chapter 17A because the IDOT's

review of the statistics and data was comprehensive, reviewing more than simply speed data or crash data. The court concluded that the IDOT's actions were reasonable and logical and thus did not violate chapter 17A.

The Cities appealed the district court's rulings on all of these issues, and we retained the appeal.

**II.  Standard of Review.**

"Judicial review of agency decisions is governed by Iowa Code section 17A.19." *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 530 (Iowa 2017) (quoting *Kay-Decker v. Iowa State Bd. of Tax Review*, 857 N.W.2d 216, 222 (Iowa 2014)). We use the standards set forth in section 17A.19(10) "to determine if we reach the same results as the district court." *Id.* (quoting *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010)).

To resolve whether the IDOT had authority to promulgate the ATE rules, we must determine whether its action was "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law." Iowa Code § 17A.19(10)(*b*).

Historically, we have said that an agency rule is "presumed valid unless the party challenging the rule proves 'a "rational agency" could not conclude the rule was within its delegated authority.' " *Meredith Outdoor Advert., Inc. v. Iowa Dep't of Transp.*, 648 N.W.2d 109, 117 (Iowa 2002) (quoting *Milholin v. Vorhies*, 320 N.W.2d 552, 554 (Iowa 1982) (en banc)); *see also Brakke*, 897 N.W.2d at 533.

However, "[t]he power of the agency is limited to the power granted by statute." *Brakke*, 897 N.W.2d at 533. In *Brakke*, we emphasized that "ultimately the interpretation and construction of a statute is an issue for the court to decide." *Id.* We do not defer to the agency's interpretation of its own statutory authority to issue a rule unless "the legislature has

clearly vested that interpretation in the agency." *Id.* This is consistent with our *Renda* line of cases. *See* 784 N.W.2d at 13.

For example, in *Kopecky v. Iowa Racing & Gaming Commission*, we declined to defer to the agency's interpretation of its own authority to issue a rule allowing it consider the economic effect of a new gaming operation on existing facilities because "we [were] not firmly convinced the legislature vested the Commission with the authority to interpret our statutes when it enacts its rules." 891 N.W.2d 439, 442 (Iowa 2017).

Similarly, we are not persuaded here that the legislature clearly vested the IDOT with interpretive authority to determine its own authority. None of the relevant statutes expressly give the IDOT interpretive authority. *Cf. Iowa Med. Soc'y v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 827, 829–30, 841 (Iowa 2013) (noting that Iowa Code section 147.76 expressly grants the nursing board interpretive authority and applying a deferential standard in determining that the board had authority to issue certain rules).

As justification for the rules, the IDOT relies in part on general provisions. *See* Iowa Code § 306.4(1) (providing that "[j]urisdiction and control over the primary roads shall be vested in the department"); *id.* § 307.12(1)(*j*) (granting authority to "[a]dopt rules . . . as the director deems necessary for the administration of the department and the exercise of the director's and department's powers and duties"). These provisions, however, contain generic terms like "jurisdiction" and "deems necessary." Such terms are widely used in "other areas of law" besides transportation and are not "specialized terms within the expertise of the agency." *Renda*, 784 N.W.2d at 14.

The IDOT also relies on its authority to eliminate "obstructions" from highway rights-of-way as found in Iowa Code chapter 318. But the

legislature has provided its own definition of "obstruction." Iowa Code §§ 318.1(4), .3. This typically presents an "insurmountable obstacle" to the conclusion that the IDOT has been vested with interpretive authority over the term. *See Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 145 (Iowa 2013). On the contrary, "it indicates we ought to apply the legislative definition ourselves." *Id.* Accordingly, we must determine ourselves whether the ATE rules are "[b]eyond the authority delegated to the agency by any provision of law or in violation of any provision of law." Iowa Code § 17A.19(10)(*b*).

In considering whether the agency followed proper rulemaking procedure under Iowa Code section 17A.4, we apply the relevant standards of section 17A.19(10). *See Iowa Fed'n of Labor, AFL–CIO v. Iowa Dep't of Job Serv.*, 427 N.W.2d 443, 445 (Iowa 1988) (en banc) (applying section 17A.19(8), now section 17A.19(10)); *see also Teleconnect Co. v. Iowa State Commerce Comm'n*, 404 N.W.2d 158, 162 (Iowa 1987) (same). The test is one of substantial compliance with section 17A.4. *Iowa Fed'n of Labor*, 427 N.W.2d at 450; *see* Iowa Code § 17A.4(5).

When the question is whether the agency erred in applying its rules, "then the challenge is to the agency's application of the law to the facts, and the question on review is whether the agency abused its discretion by, for example, employing wholly irrational reasoning or ignoring important and relevant evidence." *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 219 (Iowa 2006); *see also* Iowa Code § 17A.19(10)(*l*); *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 518 (Iowa 2012).

**III. IDOT's Authority to Promulgate the ATE Rules.**

The Cities first contend that the IDOT exceeded its statutory authority in promulgating the ATE administrative rules. Although this is framed as both a home rule argument and an argument that the IDOT

went beyond its own statutory authority in issuing the rules, the arguments are really one and the same.

Within Iowa's constitutional and statutory framework, the Cities have retained certain rights, "except as expressly limited by the Constitution of the State of Iowa, and *if not inconsistent with the laws* of the general assembly." *See* Iowa Code § 364.1 (emphasis added); *see also* Iowa Const. art. III, § 38A ("Municipal home rule"). Therefore, despite home rule, state law, implemented through valid administrative rule, will displace an otherwise valid municipal ordinance. *See* Iowa Code § 364.1; *see also* Iowa Const. art. III, § 38A. However, invalid state administrative rules cannot be enforced against a municipality. *Cf. City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 529 (Iowa 2008). The issue thus is whether the IDOT had the authority to promulgate the rules to begin with. Since we conclude they do not have the authority to do so, such rules are unenforceable against the Cities and there is no conflict between the rules and the Cities' ordinances.

In *City of Davenport v. Seymour*, we addressed whether municipal ordinances regarding ATE systems were preempted by *state law* (not state administrative rules). 755 N.W.2d 533, 535 (Iowa 2008). We held that the legislature had not preempted a Davenport ATE ordinance. *Id.* at 535–36. That case did not involve a conflict with the IDOT, nor did it involve agency action at all; the question was whether the ordinance conflicted with the statutory provisions. *Id.* The statutes at issue in that case were the "traffic regulation and enforcement provisions of Iowa Code chapter 321 (laws of the road) and sections 364.22(5)(*b*) (municipal infractions), 805.6 (form of citation in criminal cases), and 805.8A (schedule of criminal fines)." *Id.* at 537. This case presents a different question: a conflict between municipal action and state administrative rules.

Ordinarily, state agency rules are given the "the force and effect of law." *Stone Container Corp. v. Castle*, 657 N.W.2d 485, 489 (Iowa 2003) (quoting *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 835 (Iowa 2002)). However, "agencies have 'no inherent power and [have] only such authority as [they are] conferred by statute or is necessarily inferred from the power expressly given.'" *Wallace v. Iowa State Bd. of Educ.*, 770 N.W.2d 344, 348 (Iowa 2009) (alterations in original) (quoting *Zomer v. W. River Farms, Inc.*, 666 N.W.2d 130, 132 (Iowa 2003)). For a rule to be validly adopted, it "must be within the scope of the powers delegated to [the agency] by statute." *Id.* (quoting *Iowa Power & Light Co. v. Iowa State Commerce Comm'n*, 410 N.W.2d 236, 239 (Iowa 1987)). Thus, if the rules adopted by the agency "exceed the agency's statutory authority, the rules are void and invalid." *Id.* "An agency cannot by rule . . . expand or limit authority granted by statute." *Smith–Porter v. Iowa Dep't of Human Servs.*, 590 N.W.2d 541, 545 (Iowa 1999).

In deciding whether the ATE administrative rules promulgated by the IDOT were validly adopted, we must determine whether their adoption was within the scope of authority delegated to the IDOT by the legislature. "We have declined to find legislative authorization for agency rulemaking in the absence of a specific grant of authority." *Wallace*, 770 N.W.2d at 348. When the legislature has given an agency general rulemaking authority but has *also* granted specific authority in particular areas, the agency cannot then extend the specific grants beyond their scope.

Our cases reflect this principle. In *Brakke*, we found that the specific legislative grant of authority to promulgate rules "for the quarantine of diseased preserve whitetail" could not be used by the department of natural resources (DNR) to promulgate rules allowing the quarantine of (1) nondiseased deer that had also been exposed to the

disease or (2) the land where the diseased deer had been. 897 N.W.2d at 531, 541–42 (quoting Iowa Code § 484C.12(1)).

> We therefore conclude that Iowa Code section 484C.12 should be read according to its ordinary meaning. The consequence of this interpretation is that the agency lacked the statutory authority to promulgate the administrative rule expanding the scope of quarantines to include fencing of lands for a five-year period when all diseased preserve wildlife have been eradicated. As a result, the agency was without authority to issue the emergency order in this case. If the legislature wishes to expand quarantine powers as suggested by the DNR rule, it is, of course, free to do so.

*Id.* (footnote omitted). We reached this conclusion even though "Iowa Code chapter 484C generally grants DNR the authority to regulate preserve whitetail." *Id.* at 531; *see* Iowa Code § 484C.2(2) ("This chapter authorizes the department of natural resources to regulate preserve whitetail.").

We applied similar reasoning in *Wallace*. There, the plaintiffs challenged a school district's decision to close five elementary schools on the ground the school district had failed to comply with rules promulgated by the state board of education regarding school closure decisions. 770 N.W.2d at 346. The school district responded that the board of education did not have the authority to promulgate those rules, rendering them invalid. *Id.* The board had been authorized by statute to "[a]dopt rules under chapter 17A for carrying out the responsibilities of the department." *Id.* at 348 (alteration in original) (quoting Iowa Code § 256.7(5) (2003)). However, we found that this language did not grant the board "unlimited power to regulate matters within the agency's expertise." *Id.* The legislature had expressly authorized the board to adopt rules regarding many other areas, but not school closures. *Id.* at 348–49. We concluded that "the notable absence of a legislative grant to the [state board] of authority to adopt rules regulating school closure decisions" meant that

such power was not within the scope of its authority. *Id.* at 349. Therefore, the rules were void. *Id.*

Likewise, in *Litterer v. Judge*, we rejected an effort to force the secretary of agriculture to adopt rules mandating ten percent ethanol content in all motor vehicle fuel sold in Iowa. 644 N.W.2d 357, 359–60 (Iowa 2002). The secretary had refused to promulgate such a rule on the basis that she lacked the legislative authority to do so. *Id.* at 360. The statute at issue provided,

> The secretary shall adopt rules pursuant to chapter 17A for carrying out this chapter. The rules may include, but are not limited to, specifications relating to motor fuel or oxygenate octane enhancers. In the interest of uniformity, the secretary shall adopt by reference or otherwise specifications relating to tests and standards for motor fuel or oxygenate octane enhancers, established by the American society for testing and materials (A.S.T.M.), unless the secretary determines those specifications are inconsistent with this chapter or are not appropriate to the conditions which exist in this state.

*Id.* at 363 (emphasis omitted) (quoting Iowa Code § 214A.2(1) (1999)).

In other words, Iowa law gave the secretary of agriculture authority to adopt rules to carry out the motor vehicle fuel statutes, including the express authority to promulgate rules relating to specifications for motor fuel. *Id.* Nonetheless, we rejected the plaintiffs' appeal because there was "no specific grant of authority by the legislature in section 214A.2 permitting the secretary to regulate the content level of ethanol in motor fuel." *Id.* In our examination of the legislative history and the meaning of other terms in the statute, we did not find evidence of legislative intent to bestow this authority. *See id.* at 363–65. Therefore, despite the existence of a closely related grant of authority, we decided the statute did not confer authority to promulgate rules mandating ethanol content. *See id.* at 365.

In another case, we found that the DNR lacked statutory authority to issue an administrative order pertaining to the cleanup of solid waste. *First Iowa State Bank v. Iowa Dep't of Nat. Res.*, 502 N.W.2d 164, 168 (Iowa 1993). The DNR had determined that a bank foreclosing on property was responsible for the cost of cleanup of illegally dumped solid waste on the site. *Id.* at 165. We acknowledged that "[s]pecific statutory authority for adopting administrative rules relating to solid waste is provided in section 455B.304." *Id.* at 168. However, we also noted that "no reference is made to adoption of rules relating to cleanup of open dumps." *Id.* Additionally, Iowa law imposed liability "for cleanup of a hazardous condition . . . upon a person having control over the hazardous substance." *Id.*

Given these statutory provisions, we reasoned that the DNR lacked the necessary authority. *Id.* Interpreting the statute to provide the agency with authority to issue the administrative order would have imposed broader liability for cleanup of solid waste than for cleanup of hazardous waste—contrary to the underlying statutory scheme. *See id.* We agreed with the district court that "the action of the DNR is in excess of the statutory authority granted to it." *Id.*

*Barker v. Iowa Department of Transportation* also found that the department of transportation had exceeded its rulemaking authority. 431 N.W.2d 348 (Iowa 1988). There, the department revoked a driver's license on the basis of a breath test that had indicated a blood alcohol content of .108%. *Id.* at 348–49. The legal challenge concerned department rules that had established the margin of error for a blood test at plus or minus five percent. *Id.* at 349. The underlying statute referenced an "established margin of error" but neither designated that margin nor expressly authorized the department to make the designation. *Id.* (quoting Iowa Code § 321J.12 (1987)). Because the administrative rules review

committee challenged the rule, the burden was on the agency to establish its authority to promulgate the rule. *Id.* The department pointed to its general statutory authority to promulgate administrative rules to carry out any laws whose enforcement was vested in the department. *Id.* at 350. However, we found that the department lacked the authority to establish a standard for what would constitute a violation, as such a power must be expressly given. *Id.* ("Authority for such a power cannot be implied . . . ."). The authority to approve devices could not be broadly interpreted as including authority to promulgate a rule "establishing a margin of error for the devices it has approved." *Id.*

In another case, several public utility companies challenged the state commerce commission's authority to promulgate a rule requiring utility financing of energy conservation measures. *Iowa–Ill. Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 334 N.W.2d 748, 749 (Iowa 1983). There, we found that even the express statutory mandate that "[t]he commission shall promulgate rules concerning the use of energy conservation strategies by rate or service regulated gas and electric utilities" was not sufficient to confer authority to promulgate rules requiring utility financing of conservation measures. *Id.* at 752 (quoting Iowa Code § 476.2 (1981)). "Such commission authority, if it exists, must be implied from the statutory language the commission relies on." *Id.* Using the ordinary meaning of the statutes, we concluded that the phrases "programs designed to promote" and "rules concerning the use of" meant the commission had the authority "to encourage, influence, and provide incentives relating to energy conservation." *Id.* However, that *still* was not enough to give the authority to require utility financing of energy conservation, undeniably a method of achieving energy conservation. *Id.* We found that the Code provisions "relied on by the commission do not

mention financing at all, let alone permit it." *Id.* at 753. Therefore, the commission did not have the authority to promulgate rules requiring utility financing. *Id.* Because the authority to require financing was a "departure from traditional utilities regulation," we concluded "that it must be clearly manifested by legislative enactment." *Id.* at 754.

In *Marquart v. Maucker,* an employee of a state university successfully contested an administrative rule that had resulted in withholding from her final paycheck. 215 N.W.2d 278, 279 (Iowa 1974). The university had established various rules and regulations for the use of its parking lots, enforceable by fines that could be deducted from an employee's paycheck. *Id.* The university put forth several statutes that it claimed as the basis of its authority, including the authority to set speed limits, but we found that these statutes could not imply the authority to adopt the parking regulations in question. *See id.* at 282.

The foregoing cases follow a pattern. In *Brakke, Wallace, Litterer, First Iowa State Bank, Barker, Iowa–Illinois Gas & Electric,* and *Marquart,* the legislature gave the agency authority to issue rules in a specific area, but not the specific area at issue. Accordingly, we found that an overarching general grant of authority was an insufficient basis for rulemaking in that area.

Even when we have upheld the agency's authority to promulgate rules, we first determined that the legislature had expressly granted statutory authority to promulgate rules related to the subject area. For example, in *Meredith Outdoor Advertising, Inc.,* we found that the IDOT could promulgate rules requiring the revocation of permits when billboard sign owners reconstructed or modified nonconforming signs more than 660 feet from an interstate without seeking a new permit. 648 N.W.2d at 116–17. There, the plaintiff appealed a decision by the IDOT revoking two

permits for outdoor advertising signs after the signs were reconstructed or modified without the plaintiff having obtained new permits. *Id.* at 112. This was in violation of the IDOT's administrative rule. *Id.* The plaintiff contended that the rule exceeded the IDOT's rulemaking authority, pointing to the fact that a different chapter, 306B, specifically granted authority to the department to "promulgate and enforce rules . . . governing the erection, maintenance, and frequency of advertising devices within six hundred sixty feet of the edge of the right of way." *Id.* at 116 (omission in original) (quoting Iowa Code § 306B.3 (1999)). Nevertheless, we found that "several other statutory sections inherently provide the department with sufficient authority to enact regulations controlling the maintenance of nonconforming signs." *Id.* at 117. We concluded that "the legislature intended to provide the department with the power to fill in any gaps within chapter 306C by enacting administrative rules." *Id.*

We noted in *Meredith Outdoor Advertising* that Iowa Code section 306C.12 generally prohibited the signs in question. *Id.* at 115. Additionally, "[s]ections 306C.18(3) and 306C.19 require sign owners such as [the plaintiff] to follow department rules or be subject to removal." *Id.* at 117. Furthermore, "[a]dditional sections provide general authority to the department to adopt such rules deemed necessary to carry out its duties." *Id.* Based on this combination of authority, we found the rule was within the IDOT's delegated authority. *See id.*

In *Overton v. State,* a prison inmate challenged the authority of the Iowa Department of Corrections to make rules requiring him to reimburse a staff member for eyeglasses broken during an altercation. 493 N.W.2d 857, 858 (Iowa 1992). The contested rule permitted the sanction of "assessed costs" when an inmate violated a disciplinary rule. *Id.* at 859. Iowa law provided, "Inmates who disobey the disciplinary rules of the

institutions to which they are committed shall be punished by the imposition of the penalties prescribed in the disciplinary rules. . . ." *Id.* (omission in original) (quoting Iowa Code § 246.505(1)). We found that the department had the necessary authority because the assessed costs constituted a penalty. *Id.*

In *Frank v. Iowa Department of Transportation,* we were charged with deciding "whether the department was within its statutory authority to conclude under its rules that a moving traffic-law violation includes failing to have a valid chauffeur's license." 386 N.W.2d 86, 88 (Iowa 1986). We determined that it was, particularly noting the statutory basis for the authority to promulgate such rules:

> Section 321.210 authorizes the department to establish rules for license suspension if the operator is found to be a habitual violator, and provides only three exclusions for violations of statutory or municipal ordinances in determining whether or not to suspend a license. Pursuant to this section, the department defines a "habitual violator" as one who has convictions for more than two moving traffic-law violations within twelve months. It then defines "moving traffic law violation" as "any traffic law violation except" ones regarding equipment, parking, registration laws, expired licenses or permits, failures to appear, weights and measures, and disturbing the peace. There are no exceptions for failing to have a valid chauffeur's license.

*Id.* (citations omitted). We pointed out that "the legislature itself did not see fit to include . . . the failure to have a valid chauffeur's license in its exemptions in section 321.210." *Id.* We concluded that the department "may properly consider the failure to have a valid chauffeur's license to be a moving traffic-law violation under its rules." *See id.*

In *Milholin,* we "decide[d] the validity and effect of a rule of the Iowa Real Estate Commission requiring all real estate listing agreements to be in a writing containing all essential terms." 320 N.W.2d at 553. The district court had found the rule to be invalid. *Id.* We reversed, deciding

that the rule was a valid exercise of the commission's authority. *Id.* The relevant chapter vested the commission "with far-reaching authority to license, regulate and discipline brokers and salespersons." *Id.* at 554. The commission also had express, general rulemaking authority. *Id.* Although the statute did not grant the specific authority to promulgate rules on this subject, the rule was nevertheless a regulatory measure over brokers and salespersons, thus allowing the commission to reasonably conclude that promulgating this rule fell within its statutory authority. *See id.*

In *Temple v. Vermeer Manufacturing Co.,* we concluded that a rule promulgated by the industrial commissioner was within its specific statutory authority. 285 N.W.2d 157, 159–60 (Iowa 1979). The rule at issue there required the commissioner "to decide an appeal on the record established before the deputy commissioner unless the commissioner is satisfied that additional evidence is material and that there was good reason for failure to present the additional evidence to the deputy commissioner." *Id.* at 159. We concluded that the rule was "well within the legislative authorization." *Id.* There, the statute provided, "In addition to the provisions of section 17A.15, the industrial commissioner, on appeal, may limit the presentation of evidence as provided by rule." *Id.* (quoting Iowa Code § 86.24 (1979)). We noted that section 86.24 was a "particular statutory basis for the rule," and thus the rule was within the commissioner's authority. *Id.* at 160.

*Meredith Outdoor Advertising, Overton, Frank,* and *Temple* fall into the pattern we have already noted. In those cases, legislation gave the agency specific authority to decide when billboards could be permitted that were visible from an interstate highway (although more than 660 feet away from the highway), impose penalties, define a moving violation, and limit evidence. Thus, in each of those cases, the agency rule was upheld. As

noted, the trend of the above cases is that when the statute has granted general rulemaking authority and followed it up with specific authority over particular areas, the agency is not free to interpret the general rulemaking authority as granting *unlimited* rulemaking authority. Neither may the agency interpret the specific grants of authority broadly so as to encompass areas not clearly included within those grants.

*Milholin* is, perhaps, more difficult to reconcile with the rest of the caselaw. The real estate commission had been given authority over the licensing, regulation, and disciplining of brokers and salespersons. 320 N.W.2d at 554. We concluded that a rule requiring listing agreements to be in writing was a rational way to "regulat[e] broker conduct to protect the public." *Id.* *Milholin* was decided thirty-six years ago and should be read along with more recent decisions.[3]

We turn now to the IDOT's asserted basis for authority here. The IDOT points to its specific statutory authority to remove "obstructions" from the highway right-of-way of the primary highway system. *See* Iowa Code §§ 318.4, .7 (2013). However, an "obstruction"

> means an obstacle in the highway right-of-way or an impediment or hindrance which impedes, opposes, or interferes with free passage along the highway right-of-way, not including utility structures installed in accordance with an approved permit.

*Id.* § 318.1(4). The legislation continues,

---

[3]Notably, a dissenting opinion urged,

> The subject of the form or contents of contracts between realtors and listers does not come within the scope of the chapter. We are already inundated by a proliferation of agency rules. I do not think we should enlarge agencies' rule-making powers additionally by construing statutes beyond what appears to be legislative intent in those statutes.

*Milholin*, 320 N.W.2d at 556 (Uhlenhopp, J., dissenting).

A person shall not place, or cause to be placed, an obstruction within any highway right-of-way. This prohibition includes, but is not limited to, the following actions:

1. The excavation, filling, or making of any physical changes to any part of the highway right-of-way, except as provided under section 318.8.

2. The cultivation or growing of crops within the highway right-of-way.

3. The destruction of plants placed within the highway right-of-way.

4. The placing of fences or ditches within the highway right-of-way.

5. The alteration of ditches, water breaks, or drainage tiles within the highway right-of-way.

6. The placement of trash, litter, debris, waste material, manure, rocks, crops or crop residue, brush, vehicles, machinery, or other items within the highway right-of-way.

7. The placement of billboards, signs, or advertising devices within the highway right-of-way.

8. The placement of any red reflector, or any object or other device which shall cause the effect of a red reflector on the highway right-of-way which is visible to passing motorists.

*Id.* § 318.3.

The list of potential obstructions in Iowa Code section 318.3 does not include ATE equipment, nor does it include anything comparable to ATE equipment. *Id.* § 318.3. The first seven items consist of physical obstacles within the right-of-way. *Id.* § 318.3(1)–(7). The last item, a "red reflector," is presumably included because a red reflector is a recognized warning device for motorists. *See id.* § 321.389 (requiring a red reflector on the rear of all vehicles). Therefore, a red reflector that *wasn't* warning

about a vehicle or other hazard could throw motorists off the track and itself pose a danger.[4]

Significantly, Iowa Code chapter 318 requires every "obstruction" to be removed and provides that any person who places an "obstruction" in a highway right-of-way is deemed to have created a public nuisance. *See id.* §§ 318.5(1)–(2), .6(1) (2013). So if the IDOT's interpretation were correct, the Cities would be creating a public nuisance. Also, the prohibition only applies to obstructions "within any highway right-of-way." *Id.* § 318.3. Notably, all the interstate ATE systems at issue in this case were mounted on existing overhead truss signs.[5]

Reading chapter 318 as a whole, it is not plausible to use the term "obstruction" for a traffic camera that takes a photograph for law enforcement purposes of a vehicle going more than ten miles over the speed limit.[6]

The IDOT also relies on two broadly worded statutes: Iowa Code sections 307.2 and 307.12(1)(*j*). The former states that the IDOT "shall be responsible for the planning, development, regulation and improvement of

---

[4]Chapter 318 was enacted in 2006. 2006 Iowa Acts ch. 1097. Its predecessor, chapter 319, contained a provision that served a similar purpose:

> Except for official traffic-control devices as defined by section 321.1, subsection 46, no person shall place, erect, or attach any red reflector, or any object or other device which shall cause a red reflectorized effect, within the boundary lines of the public highways so as to be visible to passing motorists.

Iowa Code § 319.12 (2005).

[5]In several instances, the IDOT gave the Cities the option of disabling, rather than removing, the ATE equipment. If the equipment were really an "obstruction" within the meaning of chapter 318, disabling would not be a remedy.

[6]Similarly, we do not believe that the IDOT had authority to promulgate the rules under Iowa Code section 321.348, which makes it "unlawful for any city to close or obstruct any street or highway which is used as the extension of a primary road within such city . . . ." Iowa Code § 321.348. Whatever their merits or demerits, the ATE systems are not an "obstruction."

transportation in the state as provided by law." *Id.* § 307.2. Section 307.12(1)(*j*) authorizes the director of the department to "[a]dopt rules in accordance with chapter 17A as the director deems necessary for the administration of the department and the exercise of the director's and department's powers and duties." *Id.* § 307.12(1)(*j*).

The IDOT argues that these general provisions sustain the ATE rules. However, neither of these two provisions broadens the *reach* of the IDOT; rather, each incorporates and relies upon other legal sources. Iowa Code section 307.2 states that the IDOT is responsible for the regulation of transportation "as provided by law." Section 307.12 empowers the IDOT to adopt rules to exercise its "powers and duties." In other words, the IDOT can adopt rules, but they have to be in furtherance of legal authority that the agency otherwise possesses.

The IDOT's argument runs contrary to our prior holdings in *Wallace, Litterer, Iowa–Illinois Gas & Electric, Barker, Brakke,* and *First Iowa State Bank.* For example, in *Wallace* we said, "[G]eneral authorization of this type does not grant to an administrative agency unlimited power to regulate matters within the agency's expertise." 770 N.W.2d at 348. Furthermore, the delegation of authority to the IDOT over other specific areas prevents the IDOT from claiming specific authority here.[7]

The other statutes cited by the IDOT as authority for promulgating the ATE rules are similarly generic and not specific to ATE systems. Iowa Code section 306.4(1) states that "[j]urisdiction and control over the

---

[7]Our decision in *Lenning v. Iowa Department of Transportation* provides a useful contrast to the present case. 368 N.W.2d 98 (Iowa 1985). There we upheld an IDOT rule that made persons with prior license revocations based upon OWI convictions ineligible for work permits during the period of a subsequent revocation. *Id.* at 100. Although we quoted the IDOT's general rulemaking authority in a footnote, we sustained the rule because the underlying statute specifically gave the IDOT discretion on whether to issue temporary restricted licenses in these circumstances. *Id.* at 101–02 & n.1.

primary roads shall be vested in the department." Iowa Code § 306.4(1). Section 306.4(4)(*a*) provides,

> Jurisdiction and control over the municipal street system shall be vested in the governing bodies of each municipality; except that the department and the municipal governing body shall exercise concurrent jurisdiction over the municipal extensions of primary roads in all municipalities. When concurrent jurisdiction is exercised, the department shall consult with the municipal governing body as to the kind and type of construction, reconstruction, repair, and maintenance and the two parties shall enter into agreements with each other as to the division of costs thereof.

*Id.* § 306.4(4)(*a*). The IDOT argues that "[s]ections 306.4(1) and 306.4(4)(*a*) should be read together and harmonized with the DOT having final authority to adopt the subject ATE rules."

We are not persuaded. We think that the ordinary meaning of "jurisdiction and control over the primary roads" in this context means that the department has authority over the establishment, alteration, and vacation of such roads. Those are the subjects covered by Iowa Code chapter 306. *See City of Cedar Rapids v. State*, 478 N.W.2d 602, 605 (Iowa 1991) ("We believe that the intent and purpose of [section 306.4(3) (now 306.4(4))] is to establish the jurisdiction and control of municipalities in the establishment, alteration, and vacation of roadways within the municipal limits.").

The IDOT's argument proves too much. Suppose the Cities decided to station numerous patrol cars on Interstates 380 and 235 and Highway 61 to catch and ticket speeders. Could the IDOT issue a rule banning the practice on the ground that it has "jurisdiction and control" over these roads? Clearly not.

Furthermore, Iowa Code section 321.285(5) gives the IDOT authority to establish speed limits under circumstances on "fully controlled-access

. . . highways." *See* Iowa Code § 321.285(5). But missing from this specific grant is any authority over *methods* of enforcing speed limits. *See Litterer*, 644 N.W.2d at 365.

*Brakke* is instructive here, because it is in many ways analogous to the present case. 897 N.W.2d 522. Like the IDOT, the DNR possesses broad authority over its domain. Section 455A.2 states, "A department of natural resources is created, which has the primary responsibility for state parks and forests, protecting the environment, and managing fish, wildlife, and land and water resources in the state." Iowa Code § 455A.2. Furthermore, Iowa Code section 484C.2(2) "authorizes the department of natural resources to regulate preserve whitetail," and the DNR is imbued with a statutory authority to "adopt rules pursuant to chapter 17A as necessary to administer" the chapter regarding whitetail deer. *Id.* § 484C.3.

Nonetheless, in *Brakke*, we found that the DNR could not promulgate quarantine rules outside the particular scope of section 484C.12, even though those rules might appear otherwise consistent with the broad rulemaking authority and legislative intent to protect whitetail deer. 897 N.W.2d at 533–34. We noted the department's argument that the clear legislative intent was to eradicate the particular disease at issue, since it was mentioned by name by the legislature. *Id.* at 532 ("According to the DNR, it would make no sense for a legislature so concerned with [this disease] to deny the state regulatory authorities the ability to protect the whitetail population from a primary pathway for transmission of the disease, namely exposure to prion-contaminated land."). The expanded quarantine was certainly consistent with that goal. *See id.* Still, the rulemaking authority given to the department did not extend beyond the type of quarantine referred to in Iowa Code section 484C.12(1). *Id.* at 541.

Likewise, here, the IDOT's general mission to preserve motorist safety is not enough to allow it to deviate from its specific statutory authority, by treating an ATE system as a right-of-way obstruction. As we said in *Brakke*, if the legislature wants to expand the IDOT's powers to include regulation of ATE systems, "it is, of course, free to do so." *Id.* at 541–42.

Other state legislatures have expressly vested state agencies with authority over ATE systems. *See, e.g.*, Ariz. Rev. Stat. Ann. § 28–641 (Westlaw through 2d Reg. Sess. 2018) (giving the department of transportation the authority to "adopt a manual and specifications for a uniform system of control devices," including photo enforcement systems); 625 Ill. Comp. Stat. Ann. 7/10 (West, Westlaw through P.A. 100–585 of 2018 Reg. Sess.) (granting the department of state police the authority to establish ATE systems); Md. Code. Ann., Transp. § 25-104 (West, Westlaw through 2018 Reg. Sess.) ("The State Highway Administration shall adopt a manual and specifications for a uniform system of traffic control devices," including automatic speed monitoring systems). To date, our general assembly has not pursued this course of action.[8]

The IDOT contends that by not enacting legislation to *overturn* the ATE rules, the legislature has impliedly *endorsed* them. The IDOT cites *State v. Miner*, where we said,

> The Iowa Administrative [P]rocedure Act affords the legislature
> an opportunity to object to agency rules and to override them
> by statute. These steps were not taken by the legislature;
> therefore, we assume that the legislature approved of the

---

[8]As noted, the legislature has specifically empowered the IDOT to act in other areas, but not with respect to ATE systems. We have long recognized the principle of *expressio unius est exclusio alterius*, i.e., the expression of one is the exclusion of the other, as an aid to statutory interpretation. *See, e.g., Staff Mgmt. v. Jiminez*, 839 N.W.2d 640, 649 (Iowa 2013); *Thomas v. Gavin*, 838 N.W.2d 518, 524 (Iowa 2013); *Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008).

> requirement that brokers be licensed as dealers and of the resulting application of the title requirements to *all* who initiate the retail sale of motor vehicles.

331 N.W.2d 683, 687 (Iowa 1983) (citation omitted). However, *Miner* is distinguishable. *Miner* involved a specific grant of legislative authority to adopt the rule at issue. *Id.* at 686. We found that the administrative rule "was only verbalizing what section 322.3(2) had already directed." *Id.* The administrative rule, in other words, "was following what the legislature had already directed in section 322.3(2)." *Id.* at 687. Here, the rule lacks such support. We are unwilling to adopt a principle that whenever the legislature declines to pass legislation overturning a rule, it has statutorily authorized that rule. This flips article III and article IV of the Iowa Constitution.

In 2014, the general assembly enacted a statutory ban on the use of drones for traffic law enforcement. *See* 2014 Iowa Acts ch. 1111, § 1 (codified at Iowa Code § 321.492B) (2015). This shows that the legislature has the ability to enact laws regulating newer methods of traffic law enforcement.

Therefore, we conclude that the IDOT did not have statutory authority to promulgate the administrative rules dictating placement and continued use of ATE equipment by the Cities. As a result, the agency was without authority to rely on those rules to order the Cities to move, remove, or disable their ATE systems.

Because of our determination that the IDOT lacked authority to issue the ATE rules, we need not reach the Cities' additional arguments that the IDOT failed to comply with proper rulemaking procedure in adopting the 1000-foot rule, or that the ATE rules and their application to the Cities were illogical and wholly irrational, failed to address relevant and important information that a rational decision-maker would consider,

and were otherwise arbitrary and capricious.  *See* Iowa Code § 17A.4(1)(*a*); *id.* § 17A.19(10)(*i*), (*j*), (*n*).

## IV. Conclusion.

We conclude that the IDOT was without statutory authority to promulgate its administrative rules regarding the municipalities' ATE systems.  We reverse the district court's order and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All justices concur except Hecht, J., who takes no part.